IN THE MATTER OF LILLIAN BOTZ, LILLIAN BOTZ, RESPONDENT, v. R. P. GARRETT, F. E. LAWRENCE, JR., A. B. M. CARRUBA, H. B. DEAL, AND GERALD B. O'REILLY, AS MEMBERS OF AND CONSTITUTING THE BOARD OF ADJUSTMENT OF THE CITY OF ST. LOUIS, AND THE CITY OF ST. LOUIS, A MUNICIPAL CORPORATION, INTERVENOR, APPELLANTS.—159 S. W. (2d) 367.

St. Louis Court of Appeals. Opinion filed March 3, 1942.

568.

*D. Calhoun Jones* for respondent.

*Joseph F. Holland, Oliver Senti* and *Orville Richardson* for appellants.

BENNICK, C.—This is an appeal from the judgment of the Circuit Court of the City of St. Louis reversing the decision of the Board of Adjustment of the City of St. Louis denying the application of respondent, Lillian Botz, for a permit to operate a parking lot for automobiles on certain land she owns which is located in a multiple dwelling district as established by the zoning ordinance of the City of St. Louis. [Secs. 160-185, Revised Code of St. Louis 1936.]

The entire parcel of land which respondent owns is located on the northeast corner of Grand Boulevard and Magnolia Avenue, fronting 135 feet on Grand Boulevard, and extending eastwardly between parallel lines for 270 feet to Alhambra Court, a street primarily devoted to residential purposes, which lies one block to the east of Grand Boulevard. The land is bounded on the south by Magnolia Avenue, and on the north by a lot of equal depth, which is occupied by a ten-story apartment building known as the Marmaduke Apartments, which faces on Grand Boulevard, and in the rear of which is a private garage for tenants only, fronting on Alhambra Court.

Under the provisions of the zoning ordinance with respect to use districts, the west half of respondent's land, that is, the portion fronting on Grand Boulevard and extending back to a depth of 135 feet on Magnolia Avenue, is located in a commercial district, while the east or rear half, comprising the remaining 135 feet on Magnolia Avenue and extending back to Alhambra Court, is placed in a multiple dwelling district.

As will presently appear, it is such east or rear half of her land that respondent desires to make use of as a parking lot; which character of use, though permitted in a commercial district, is not authorized by the ordinance in the case of land lying in a multiple dwelling district. Consequently, if respondent is to have a permit for the operation of a parking lot upon that portion of her land which lies in a multiple dwelling district, it must either be upon the theory of a nonconforming use of such land at the time of the adoption of the ordinance in 1926, or else upon the theory that because of practical difficulties or unnecessary hardship to be encountered in a compliance with the strict letter of the ordinance, the board of adjustment, in the exercise of a sound and proper discretion in the discharge of the special function conferred upon it, should have varied or modified the application of the ordinance with respect to the use of such portion of her land so as to have permitted the operation of a parking lot upon it, notwithstanding the lack of specific authorization—and therefore the effectual prohibition against such use—in that section of the ordinance (Sec. 164) defining the character of use to which premises situated in a multiple dwelling district may be lawfully subjected.

The property in question was formerly occupied by Mission Inn, a well-known landmark of the preprohibition days, which fronted the full width of the lot on Grand Boulevard and extended eastwardly for some 120 feet. To the rear of the Mission Inn was a beer garden; and in the rear portion of the lot, on the Magnolia Avenue side, was a garage which was used for the repair, but not the storage, of automobiles, and at which, at least in the latter days of its existence, gasoline and automobile supplies were sold. At one time during the prohibition period a miniature golf course was conducted on the rear portion of the premises. As for the use of such rear portion of the premises for parking purposes, it would appear that during the heyday of Mission Inn, certain of its patrons may have sporadically parked their automobiles upon the lot; and, as a matter of fact, during the course of the hearing on respondent's application for a permit, one of the members of the board recalled that he himself had followed the practice of parking his own automobile there when he would have occasion to visit Mission Inn. It seems clear, however, that such rear portion of the premises was never at any time specifically set apart or utilized as a parking lot; and indeed respondent's counsel himself expressly stated at the hearing before the board that regardless of the fact that automobiles had formerly been parked upon the lot by patrons of the Inn, "apparently it was not used for parking as we wish to use it."

In 1937 the building which had housed the Mission Inn was torn down, and shortly thereafter a building was erected in its place for occupancy by an A. & P. market. This building, which faces on

Grand Boulevard, extends to the rear for the full distance of 120 feet that the Mission Inn had occupied, but only extends northwardly along Grand Boulevard for a distance of 60 feet in width, leaving a space of 75 feet in width between the store building and the Marmaduke Apartments which at present is utilized as a parking space for the automobiles of customers of the store. This, of course, is in the front portion of respondent's land which is zoned in a commercial district, so that the use of such portion of the premises for parking purposes is entirely permissible under the ordinance, but quite unsatisfactory to respondent herself, who insists that an unnecessary hardship is thereby imposed upon her by being compelled to use her valuable Grand Boulevard frontage for a parking space rather than the relatively much less valuable portion of her premises which fronts on Alhambra Court to the rear.

Being desirous of putting her Grand Boulevard frontage to a more productive use, respondent, on June 14, 1939, applied to the building commissioner for a permit to operate a parking lot on the east or rear half of her property fronting on Alhambra Court, which portion of her property, it will be recalled, is zoned in a multiple dwelling district within which the ordinance does not authorize the use of premises for a parking lot such as respondent proposes to maintain. Her purpose is to provide a lot for the accommodation of the customers of the A. & P. store, upon which lot, according to the statement of her counsel at the hearing before the board, the expectation was that ''about 50 to 60 cars would be parked at various times.''

The building commissioner refused to issue the permit upon the ground that the maintenance of a parking lot did not conform to the uses permitted in a multiple dwelling district, whereupon respondent appealed to the board of adjustment, before which a hearing was held and arguments made pro and con with respect to the question of whether a permit should be issued to respondent.

After taking the appeal under consideration, the board voted unanimously to deny the appeal, or, in other words, refused to take jurisdiction over it, upon the ground that the question presented was properly a legislative matter, and not a matter for the board of adjustment to decide. What the board undoubtedly meant was that in its view of existing conditions, any practical difficulty or unnecessary hardship in the way of carrying out the strict letter of the ordinance was not confined to respondent alone, but extended as well to all the other owners of property in the neighborhood which was zoned as respondent's property was zoned, in which event relief should come, if at all, from the board of aldermen in the form of an amendment to the ordinance, and not from the board of adjustment through a variation or modification of the application of the ordinance with respect to the use of so much of respondent's individual property as lay in a multiple dwelling district.

The statute or enabling act provides that any person aggrieved by a decision of the board of adjustment may obtain a review of the legality of such decision by a proceeding in *certiorari* sued out in the circuit court of the county or city in which the property affected is located. [Sec. 7418, R. S. Mo. 1939 (Mo. Stat. Ann., sec. 7265, p. 5858).]

In this case, following the denial of her appeal upon the ground that the question presented was a legislative matter and not a matter for the board of adjustment to decide, respondent sued out a writ of *certiorari* in the Circuit Court of the City of St. Louis, which court thereafter remanded the case to the board of adjustment with directions to hear and determine the appeal on its merits.

Subsequently, in accordance with the directions of the circuit court, the board of adjustment set the matter down for a hearing on its merits, and, by consent of the parties, took the case under submission upon the evidence adduced at the previous hearing. Again the question of whether respondent should be granted her permit was considered by the board, and again her appeal was denied (by the concurring votes of four members, one member being absent), this time upon the ground that the granting of the permit would not lessen the fire hazard, improve property values, lessen congestion on the land, or promote the general welfare.

It is to be borne in mind that the board, confronted with the strict letter of the zoning ordinance that parking lots, not being specifically authorized, were thereby excluded from land situated in a multiple dwelling district, was considering the matter from the standpoint of whether, in the exercise of the discretion conferred upon it by both the statute and the ordinance, it should vary or modify the application of the ordinance in respondent's individual case. Such a variation or modification of the strict letter of the ordinance respecting the use of land is only authorized ''so that the spirit of the ordinance shall be observed, public safety and welfare secured and substantial justice done;'' and when the decision of the board is read in the light of the considerations by which the statute and ordinance circumscribe the exercise of the board's discretion, it is evident that what the board concluded was that a variation or modification of the application of the ordinance so as to permit respondent to maintain a parking lot on that portion of her land situated in a multiple dwelling district would not be an observance of the spirit of the ordinance, secure the public safety and welfare, or do substantial justice with proper regard for the rights of all persons who might be affected by the granting of the permit.

For a second time respondent sued out a writ of *certiorari* in the circuit court to review the legality of the decision of the board of adjustment, and prior to the hearing of the case the City of St. Louis prayed for and was allowed the right to intervene and adopt the

return theretofore made to the writ on behalf of the board of adjustment.

At the hearing in the circuit court, which of course had before it the record made up before the board of adjustment, both sides to the controversy introduced additional evidence as the statute permits to be done in cases where it appears to the court that additional evidence is necessary for the proper disposition of the matter.

At the conclusion of the hearing, the court entered its judgment reversing the decision of the board of adjustment; and from the judgment so entered, the city and the board have perfected their joint appeal to this court in the usual course.

The question before this court is whether the lower court committed error in reversing the decision of the board of adjustment.

Before the lower court was entitled to hold that the board had illegally denied respondent's application for a permit to maintain a parking lot upon that portion of her premises which lies in a multiple dwelling district, one of two things must have conclusively appeared—either that such use of the land was permissible as a continuation of a lawful nonconforming use existing at the time of the adoption of the ordinance; or else that the enforcement of the strict letter of the ordinance in respondent's case would cause unnecessary hardship which the board could and should have obviated, in a proper exercise of its administrative discretion, by varying or modifying the application of the ordinance, while at the same time fully effectuating the spirit of the ordinance, securing the public safety and welfare, and doing substantial justice with respect to the rights of all parties whose interests might be affected.

While the ordinance provides (Sec. 168) that the lawful use of land existing at the time of the adoption of the ordinance may continue even though such use does not conform to the provisions of the ordinance, respondent makes no contention that the specific nonconforming use which she proposes to make of her land, that is, the maintenance of a parking lot upon it, existed at the time of the adoption of the ordinance. On the contrary, as we have already indicated, her counsel, at the hearing before the board, expressly admitted, in accord with what the evidence disclosed, that even though, during the time of the operation of Mission Inn, there was a garage on the rear of the lot and automobiles parked there, "apparently it was not used for parking as we wish to use it." What respondent does insist is merely that the land has always been used for commercial purposes; and she therefore contends that since such commercial use, whatever it may have been, constituted a nonconforming use at the time of the adoption of the ordinance placing the rear half of her land in a multiple dwelling district, she should now be permitted, under the nonconforming use section of the ordinance, to subject that portion of her land to the particular commercial use

which she now proposes, even though such use is concededly not identical with the use which was being made of the land at the time of the adoption of the ordinance.

In support of her contention, respondent counts upon the second paragraph of Section 168, which provides that in the case of buildings, as distinguished from land, the lawful use of a building existing at the time of the adoption, amendment, or change of the ordinance may not only continue even though such use does not conform to the provisions of the ordinance, but also that if no structural alterations are made, a nonconforming use of a building may be changed to another nonconforming use of the same or a more restricted classification. Still further the ordinance provides that any building which has been designed and erected for a definite purpose, and was used for such purpose before the passage of the ordinance, shall be permitted to be continued for such use, even though nonconforming, and this notwithstanding a lapse of time having existed between the discontinuance of its use and the recommencement of the same.

The plain language of the section, coupled with its arrangement in two separate and distinct paragraphs, the first dealing with nonconforming uses of land and the second with nonconforming uses of buildings, leaves no room for reasonable controversy but that the provision permitting a change from one nonconforming use to another, or the subsequent resumption of a definite nonconforming use once abandoned, is purposely limited to the use of buildings erected before the enactment of the ordinance, and does not extend to the use of unimproved land. Indeed, there is a very logical and sound reason for making such distinction. A building represents an investment in the improvement of the land upon which it is erected; and if regard were not had for the reasonable protection of such investment, then the ordinance would frequently be confiscatory with respect to its application to particular structures. Not only is a building erected with a view to its adaptation to a specific form of use which is to be made of it, but it is often difficult, if not impossible, to convert it to an entirely different form of use. Consequently, where the building is only adaptable to nonconforming uses, the ordinance grants the special privilege, where no structural alterations are involved, of changing from one nonconforming use to another of the same or a more restricted classification, and also allows the recommencement of a definite nonconforming use which has been previously discontinued. Not so, however, in the case of land, where the owner has made no investment in its improvement, and where, in most instances, he would be expected to suffer no hardship if compelled to conform to the strict letter of the zoning plan with respect to the use to which his land might be subjected.

The underlying spirit of a comprehensive zoning plan necessarily implies the restriction, rather than the extension, of a nonconforming

use of land, and therefore to whatever extent the particular act fails to make express provision to the contrary, a condition that the lawful nonconforming use of land existing at the time of the adoption of the ordinance may continue must be held to contemplate only a continuation of substantially the same use which existed at the time of the adoption of the ordinance, and not some other and different kind of nonconforming use which the owner of the land might subsequently find to be profitable or advantageous. In this instance the land in question was admittedly not being used at the time of the adoption of the ordinance as respondent now proposes to use it, and consequently she is not entitled to a permit to maintain a parking lot upon her premises by virtue of the nonconforming use provision of the ordinance.

This brings us then to the question of whether there was a legitimate basis for the lower court to conclude that the board had been guilty of a manifest abuse of its discretion in refusing to vary or modify the application of the ordinance with respect to respondent's proposed use of the rear portion of her premises as a parking lot.

As we have already pointed out, where there is practical difficulty or unnecessary hardship in the way of carrying out the strict letter of the ordinance in a specific case, the board has the power to vary or modify the application of the provisions of the ordinance relating to the use of land ''so that the spirit of the ordinance shall be observed, public safety and welfare secured and substantial justice done.'' However, the board can in no case relieve from a substantial compliance with the ordinance; and its administrative discretion is confined within the narrow compass which allows a variation or modification to be made in the case of a particular property owner only in the event that such variation or modification at the same time fully effectuates the spirit and purpose of the ordinance. [State ex rel. v. Kansas City, 325 Mo. 95, 27 S. W. (2d) 1030; Berard v. Board of Adjustment of City of St. Louis (Mo. App.), 138 S. W. (2d) 731.]

In a judicial review of the act or decision of an administrative tribunal which is charged by law with the performance of a particular function, the tribunal may not be convicted of having reached an arbitrary, capricious, and illegal result, if its decision was based upon substantial evidence, and the correct principle of law was applied to the facts which were found to exist. [Howlett v. Social Security Commission, 347 Mo. 784, 789, 149 S. W. (2d) 806, 810.]

In the case at bar, we think it is beyond question that the refusal of the board to vary the application of the ordinance so as to permit respondent to maintain a parking lot upon that portion of her premises located in a multiple dwelling district was amply supported by substantial evidence. The board of course had in mind the noise, fumes, dust, and confusion which necessarily attend the operation of a parking lot, and properly took into account the injurious con-

sequences which such conditions would inevitably work upon the residential property in the neighborhood. It also had before it the likelihood that traffic congestion in and around the entrances to the lot would necessarily impede and interfere with the local unit of the fire department in its use of the enginehouse which is situated just east of the property in question. It no doubt appreciated that respondent's forced use of a certain portion of her valuable Grand Boulevard frontage for parking purposes imposed a considerable hardship upon her, but it must have concluded that respondent's own personal difficulties did not outweigh the community's interest, or warrant the casting of the inconveniences of a parking lot upon the Alhambra Court and Magnolia Avenue residents so that respondent herself could be freed of such inconveniences in her use of that portion of her property which faced Grand Boulevard.

Undoubtedly respondent would find it much to her own financial profit and advantage if she should be allowed to convert the rear half of her premises into a parking lot, but such fact alone could be no excuse for varying the application of the ordinance with respect to the use to which her land might be subjected. Practical difficulties or unnecessary hardship in the way of carrying out the strict letter of the ordinance are the factors which call into play the power of the board to vary or modify the application of the ordinance in a specific case, but before a variation or modification may be allowed, it must at the same time observe the spirit of the ordinance, secure the public safety and welfare, and do substantial justice to the other property owners and residents in the neighborhood.

The ultimate object and purpose of a comprehensive zoning plan is to confine within established zones or districts all uses of a similar classification, whether residential, commercial, or industrial; and the underlying spirit of such a plan must therefore be to diminish, and not to extend, nonconforming uses of property affected by the zoning ordinance. Respondent's application, however, is to extend nonconformity by establishing a parking lot in a multiple dwelling district from which parking lots, not being specifically provided for, are thereby effectually excluded. Not only was there substantial evidence to support the board's denial of respondent's application, but indeed it is difficult to see how the granting of the application could ever have contemplated a substantial compliance with the ordinance on respondent's part, without which the board lacked the power to vary or modify the letter of the ordinance with respect to the use of respondent's individual property. [State ex rel. v. Kansas City, *supra*; Berard v. Board of Adjustment of City of St. Louis, *supra*.]

The court, in its review of the decision of the board, may not substitute its own discretion for that of the board, or, in a case where different fact findings are permissible, direct the entry of such an

order as in its opinion the board should have entered in the first instance. On the contrary, the power of the court is expressly limited to the correction of illegality in the board's decision, to which end it is empowered to make such disposition of the case as may be necessary in order to correct the illegality. [State ex rel. v. Kansas City, *supra*; Berard v. Board of Adjustment of City of St. Louis, *supra*; State ex rel. v. Holekamp (Mo. App.), 151 S. W. (2d) 685; Superior Press Brick Co. v. City of St. Louis (Mo. App.), 155 S. W. (2d) 290.]

In the case at bar, the board's decision was not arbitrary, capricious, or illegal, but instead was based upon a deliberate exercise of a sound administrative discretion designed to observe the spirit of the ordinance, secure public safety and welfare, and do substantial justice.

This being so, the circuit court was in error in reversing the decision of the board, from which it follows that the judgment of the circuit court should itself be reversed and the cause remanded with directions to enter up a new judgment affirming the decision of the board. The Commissioner so recommends.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court. The judgment of the circuit court is, accordingly, reversed and the cause remanded in accordance with the recommendations of the Commissioner. *Hughes, P. J.*, and *McCullen Anderson, JJ.*, concur.