E. C. McKINNEY, Rollie B. Hall, A. H. Myers, R. H. Collins, C. S. Gillmor and Evelyn Gillmor, Plaintiffs-Appellants,

v.

BOARD OF ZONING ADJUSTMENT OF KANSAS CITY, Missouri, Hugh R. Ennis, Thomas C. Bourke, David W. Childs, Clair H. Schroeder, and Luther Willis, as Members of said Board, Defendants-Respondents,

Catholic Diocese of Kansas City, Inc., Intervenor.

E. C. McKINNEY, Marie K. Hall, Rollie B. Hall, A. H. Myers, Gladys Collins, and R. H. Collins, Plaintiffs-Appellants,

v.

BOARD OF ZONING ADJUSTMENT OF KANSAS CITY, Missouri, et al., Defendants-Respondents,

Catholic Diocese of Kansas City, Inc., Intervenor.

Nos. 22681, 22682.

Kansas City Court of Appeals.

Missouri.

Dec. 2, 1957.

Albert Thomson, Harold T. Van Dyke, Kansas City, Davis, Thomson, Van Dyke & Fairchild, Kansas City, of counsel, for plaintiffs-appellants.

Benjamin M. Powers, City Counsellor, Guy W. Rice, Asst. City Counsellor, Kansas City for defendants-respondents.

Gordon & Cochrane, Norman P. Gordon, William W. Cochrane, Jr., Kansas City, for intervenor.

MAUGHMER, Commissioner.

This is an appeal from a circuit court judgment which affirmed, as modified by the circuit court, a decision of the Board of Zoning Adjustment of Kansas City, Missouri. This Board decision approved the granting of a building permit for construction of a Catholic Church and elementary school at 1205 West 62nd Street, Kansas City, Missouri. Appellants here include the plaintiffs in two cases below, which involved this same controversy. Catholic Diocese of Kansas City, Inc., the real recipient of the building permit intervened in each case. By agreement both were consolidated in the circuit court and for this appeal. The Board of Zoning Adjustment, the members of the board individually, and respondent-intervenor Cath-

olic Diocese of Kansas City, Inc. jointly presented their case on appeal. This group will be referred to as respondents. Catholic Diocese, on the day of the hearing before the Board, offered to provide and was able to provide 59 off-street parking spaces compared to 43 as originally contemplated. The circuit court judgment, as entered and as appealed from, required that 59 parking spaces be provided. When reference is made to ordinances, we refer to the zoning ordinances of Kansas City, Missouri.

■ Appellants present three points in their appeal. (1) The building plan providing for 59 parking spaces in a lot area of 55,000 square feet violates Section 58–4 of the ordinances; (2) The plan is in violation of Section 58–23 of the ordinances because the maximum capacity of the church exceeds 413 persons (maximum capacity for 59 parking spaces); (3) The two sections of the ordinances just mentioned are not in conflict. In order to determine if appellants' contentions, or either of them, are valid, we first examine the evidence to learn the exact physical proportions of the proposed building and, second, decide whether or not such a building can be fitted into the ordinance requirements. If the answers are still not clear and definite, then we shall look to explanatory and expert testimony as an aid in resolving these questions. All of this is done as an appellate and judicial review of an administrative decision. We have the duty and responsibility to decide (1) was the result reached illegal and not in compliance with the ordinance, and (2) was it supported by "competent and substantial evidence". As to the legality question this court, in Adams v. Board of Zoning Adjustment of Kansas City, Mo.App., 241 S. W.2d 35, loc. cit. 38, adopted and approved the following statement found in State ex rel. Nigro v. Kansas City, 325 Mo. 95, 27 S.W.2d 1030, 1033. "The review of a decision of a board of zoning appeals by the circuit court being purely statutory, the court's jurisdiction in such proceeding does not extend beyond that conferred by the statute. Looking to the statute it is apparent that the court is not vested with the power to supervise the discretion lodged with a board of zoning appeals; it is not authorized to entertain a hearing *de novo* and then make such order as in its opinion the board should have made. The court's authority is plainly limited to correcting illegality. If the court finds the order under review illegal, in whole or in part, it may reverse or affirm, wholly or partly, or may modify, the order, as may be necessary in order to correct the illegality."

■ The rule that "competent and substantial evidence" must be found was well stated in Veal v. Leimkuehler, Mo.App., 249 S.W.2d 491, 495–496: "This narrow scope of review, however, must be read in the light of the minimum standard for review provided by Constitution of 1945, art. V, § 22 [V.A.M.S.], requiring that the review of all final decisions of any administrative body in which a hearing is required shall include the determination whether the same are 'supported by competent and substantial evidence upon the whole record.' Wood v. Wagner Elec. Corp., 355 Mo. 670, 197 S.W.2d 647. The circuit court may not substitute its own judgment on the evidence for that of the board, Wood v. Wagner Elec. Corp., supra; In re Botz, 236 Mo.App. 566, 159 S.W.2d 367, loc. cit. 373, but the circuit court is authorized to decide whether the board of adjustment reasonably could have made its findings and reached its result upon consideration of all of the evidence before it, and to set aside decisions clearly contrary to the overwhelming weight of the evidence. Mann v. Mann, Mo.App., 239 S.W.2d 543".

A great number of witnesses, including a chief expert for each side, testified at the board hearing. The exhibits offered and received were numerous and voluminous, including one 22-sheet blueprint. Considering the factual and legal issues involved, we believe the evidence can be tremendously condensed and still be fair to both sides.

The situs of the combination church and school building is within a high grade residential area. It is zoned R–1 for one family dwellings and is fully developed. To prepare this spot for the proposed construction necessitated moving some houses and destruction of a few fully developed trees. No schools are in the immediate vicinity and there are no businesses close by. There was widespread and energetic opposition to the granting of this building permit. This opposition was demonstrated by the number of witnesses appearing, by the size of the protest petitions and by the vigor with which the appeal in all its stages has been prosecuted. The chief complaints voiced by those giving oral testimony, included: added traffic hazards, destruction of trees and beauty, generally, and the dilution of a pure and exclusive residential area by placing in its midst a public gathering place which these witnesses claimed would lessen all surrounding property values.

The testimony established that the proposed school use—that is, the time when children would be present—would be from 8:40 a. m. to 3:30 p. m. on Mondays through Fridays. There would be no school on Sundays, holidays or holy days. The church and school functions would not be simultaneously in operation. The original plan for which a preliminary permit was granted provided a lot area of approximately 42,000 square feet, 43 off-street parking spaces and a recreation room. Under the plans, as modified, an additional tract was included, which increased the lot area to 55,000 square feet. The number of parking spaces was increased to 59, and the recreation area was transformed into one for storage.

We believe it might be helpful to set forth the exact physical proportions of the various rooms since the parties are contesting as to how many persons can reasonably occupy each room at a time of its maximum functional use. We cannot, of course, substitute our judgment, based on these areas, for that of the Board on this critical question. We give these measurements (1) with the hope of increasing the clarity of this opinion and, (2) to aid us in determining if the board's decision was one that might be reached by reasonable minds and if it was supported by "competent and substantial evidence". In the basement, there is located the cafeteria. Its approximate measurements are 64 feet by 20 feet. There are five classrooms on the first floor. Two of these are 33 by 20 feet, and three are 32 by 20 feet. The nave is 64 feet in length by 48 feet in width, but not all of this space is occupied by seats.

Appellants' chief expert, Mr. Erling Helland, resides in Tulsa, Oklahoma and by profession is a city planning consultant. He gave it as his opinion that the ordinances required 2,000 square feet of lot area for each parking space, and that, therefore, for this 55,000 square feet, 27 parking spaces would be the maximum legally permitted. There was and is an earnest difference of opinion between the parties as to (1) should the seating capacity of the storage (recreation) area and of the cafeteria be included in determining the over-all capacity and, (2) what is the correct maximum capacity as determined by the requirements of the ordinances as to three component parts of the building, namely, the nave, the classrooms and the cry room. The witness Helland stated that the nave would seat 262 persons. He said he arrived at this figure by allowing a width of 19 inches per person. He gave the capacity of the cry room as 42, and that of the classrooms as 450.

Mr. James V. Meara of Kansas City testified that he is an architect; that in such capacity he prepared the plans for this building, and that the permit for construction was issued to him. It was his testimony that the total capacity was 407. He reached this figure by allotting to the nave, 208; to the cry room, 10; to the choir loft, 32, and to the classrooms, 157. In his computation he did not include the storage room or the cafeteria. He as-

serted that the written plans set out identical capacities. Appellants claim that the plans show the seating capacity of the nave to be 250. We have examined the blueprint of the second floor. That part thereof captioned "Nave" carries this wording: "Seating capacity 250". The choir loft and cry room are also located on the second floor, but no seating capacity is listed on the blueprint for either of them. Respondents claim and architect Meara testified that the phrase "seating capacity 250" as used in the blueprint refers to the seating capacity for the whole second floor.

We now examine the applicable provisions of the ordinances and shall set them forth in this opinion. It is conceded that the area involved in this controversy was zoned R–1. Section 58–4 of the ordinance provides in part:

"Use Regulations:

"In District R–1, no building or land shall be used * * * for other than one of the following uses * * *.

"A. Without Special Restrictions:

1. One-family dwellings.

"B. Subject to Specific Conditions Listed Below:

1. Church plants * * *.

2. Public schools * * *.

"C. Assessory Uses * * *

1. * * * A private garage or parking space, providing storage for not more than one (1) passenger motor vehicle for each two thousand (2,000) square feet of the lot area."

Section 58–23, in part provides:

"Parking for Places of Public Assembly:

1. Except in a C–4 district, for every structure or part thereof hereafter erected, * * * to be used principally as a place of public assembly or for any addition thereto, there shall be provided and maintained on the prem-

ises accessible off-street parking space for the storage of passenger motor vehicles as indicated below:

"For Churches—one space for each seven (7) persons.

"2. Methods of Computation.

"*For Churches*: In computing the number of parking spaces required, the number of persons shall be all persons present at any one time when the maximum functional use of the church plant (principal church structure and all accessory buildings) is being made.

* * * * * *

"In determining the maximum functional use, the seating capacity of the chapel, auditorium, sanctuary and classrooms, and the capacity of areas devoted to educational and recreational uses within the church plant, or addition to be constructed, shall be included.

"In respect to that portion of church buildings devoted to education, either that portion used for general assembly of classes, including departments, or the classroom seating capacity, whichever is greater, but not both, shall be used. For the portion used for recreation an area of seven square feet of floor area per person shall govern".

Other parts of these ordinances specify the size and construction specifications for such parking spaces. The parties agree that these requirements have been met.

It seems clear that Section 58–23, rather than 58–4 contains the legislative enactments respecting parking space for a church—a place of public assembly. 2,000 square feet of lot area is the minimum requirement for a private garage, but one space for each seven persons is declared to be sufficient for a church. The two ordinances from which we have quoted above unequivocally so state. These ordinances are not inconsistent. Section 58–4 has to do with private parking, while Section 58–23 is for places of public assembly. We

rule appellants' Points 1 and 3 against them. In Point 2, appellants assert that the number of persons present when the maximum functional use of the church is being made will exceed 413 (7 persons x 59 spaces) as required under Section 58–23, and, is, therefore, a violation of the ordinance. Respondents concede that if the number exceeds 413, then 59 parking spaces would be insufficient under the ordinance. The building, as planned, would not then be in conformity and appellants should prevail on this appeal.

Appellants contend that the total count should include the storage area which they assert should be classified as a recreation room since it was originally so designated. The ordinance requires inclusion of recreation, but excludes storage areas. The plans, as modified, designate this particular room as storage. Architect Meara so labeled it. The permit as granted and the judgment as entered, are on the basis of this area being constructed and used for storage, rather than recreation. We shall not go back or beyond this evidence and hold it to be a recreation room.

Now as to the cafeteria. Part of Section 58–23, which we have set out, supra, prescribes certain procedures that must be followed in determining the maximum functional use capacity. If a portion of a church building is devoted to education, that portion used for general assembly of classes, or the classroom seating capacity, whichever is greater, *but not both,* shall be used. In this building no auditorium is provided so we take the capacity of the classrooms. In computing the use of the church, the ordinance directs inclusion of the chapel, auditorium, sanctuary, classrooms, and areas devoted to educational and recreational uses. The ordinance itself makes no mention of cafeterias. Appellants cite Webster's definition of recreation as "Refreshment of the strength and spirits, after toil". Respondents cite the same authority as follows: "1. Refreshment of body and mind, as after work, by some from of play, amusement or relaxation".

"2. Any form of play, amusement or relaxation used for this purpose as games, sports, hobbies, reading, walking, etc." 76 C.J.S. p. 173, gives us a very similar definition. "Recreation. In its popular sense, the word is of very comprehensive signification, and includes in its general meaning games, sports, and plays. It has been defined as meaning amusement; amusement in sorrow or distress; diversion; refreshment of the strength and spirits, after toil; relief from toil or pain. 'Recreation' has been compared with 'amusement' see 3 C. J.S. p. 1060 note 70".

■ We do not believe that under this ordinance a cafeteria should be classified as an area of recreation. Possibly the ordinance does not affirmatively require school or church cafeterias to be included in the computation for parking spaces for the reason that ordinarily a cafeteria is not in operation concurrently with school classes or church services. We rule that the cafeteria capacity need not be included in the total.

Even with the storage room and cafeteria eliminated, respondents are not necessarily within the limitations prescribed by the ordinance. There is no real dispute as to the capacity of the choir loft (32) and the cry room (10). Architect Meara stated that the total capacity of the classrooms was 157 and the seating capacity of the nave was 208. These four figures total 407, which is just six less than the maximum permitted for 59 parking spaces. The witness Helland testified that the capacity of the nave was 262, and that of the classrooms 450.

■ If, under the ordinance, it was required that either the storage area or the cafeteria be included, then even under respondents' evidence more than 59 parking spaces would be required and the building would be in violation of the ordinance. Under those circumstances it would be apparent that the permit had been illegally issued and we would reverse the judgment and decision. But with these two areas

eliminated, only one issue remains—was there "competent and substantial evidence" that the total capacity did not exceed 413. The plans, including the blueprint, so indicate. Architect Meara testified to the total figure of 407. There was some supporting and corroborating evidence. It is true that others, especially Mr. Helland, gave positive evidence to the contrary. But our function is not to weigh this conflicting testimony. We cannot say that there was no "competent and substantial evidence" upon which the Board could base its decision in approving the issuance of the permit.

The judgment of the Circuit Court approving the decision of the Board, as modified, is affirmed.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the court.

All concur.