WOMEN'S CHRISTIAN ASSOCIATION OF KANSAS CITY, a Corporation, v. VICTOR BROWN and SADIE BROWN, Appellants.—No. 39402.—190 S. W. (2d) 900.

Division One, December 3, 1945.

*William G. Boatright* for appellants.

*Lathrop, Crane, Sawyer, Woodson & Righter, Cyrus Crane, James F. Walsh* and *Rudolph Heitz* for respondent.

HYDE, P. J.—This is a suit in equity in which an injunction was sought against defendants, alleged to be operating a dance hall upon their property in violation of the zoning laws and orders applicable to Jackson County. Such violation was found by the trial court and a permanent injunction ordered. Defendants have appealed, claiming their loss, if such use is permanently enjoined, will exceed $7500.00.

Plaintiff owned a 35 acre tract, between Wornall Road and Summit Street south of 81st Street, on which it operated the Gillis Home for orphans, where fifty to sixty orphans were enrolled at the time of the trial; and, on the same premises, it also operated the Armour Memorial Home for aged persons. Defendant owned 13 acres south of the city limits of Kansas City. On April 26, 1943, a zoning order was made by the County Court under authority of Laws 1941, p. 481, which placed defendants' property in an "A" district, zoned for residential purposes. However, both the order (Sec. 16) and the Act (Sec. 8) permitted continuance of an existing non-conforming use.

At the time of making the zoning order, there was located on defendants' land a large frame building, 200 feet by 210 feet, which had been used by defendants' vendors as a riding academy. Riding instruction had been given by a former United States Cavalry Sergeant up to 1942, when defendants purchased it; also both show horses and riding horses had been boarded there for their owners. This building was about 40 feet high in the center. Its weight was carried on steel girders 85 feet long and about 20 feet high, placed about 17 feet apart. In the center of the building, as originally constructed, was a riding and show ring; and around three sides of the inside of the building there were approximately 100 horse stalls. It had only a dirt floor. The building was 115 feet south of the north property line and 55 feet east of the west property line. The shortest distance

from defendants' building to the nearest one of plaintiff's buildings (a dormitory) was 625 feet. Outside of the building, there was another riding ring, lighted by electric lights on poles so that it could be used at night.

There was no substantial evidence to show that defendants ever operated a riding academy. When they first purchased the property, in 1942, they considered doing so and bought four riding horses and some equipment from the former owners. However, defendants' evidence showed that they never employed a riding instructor; and upon investigation of liability insurance, for such business, decided its cost was too high for profitable operations under then existing wartime conditions. They, therefore, ▓▓▓▓ operated the place as a boarding stable for both riding horses and show horses. In some instances, they furnished all feed and care for horses left there, while in others the owners sent out their own grooms and feed. Owners would come to the premises to ride or exercise their horses. During the summer of 1943, defendants also raised chickens in the building.

In October, 1943, with advice of counsel, defendants applied for a permit to operate a roller skating rink and amusement center. This application was denied. Thereafter, on January 11, 1944, on advice of another attorney, they applied for a permit to change the land use from a boarding stable to a chicken dinner and dancing place and this was denied. Defendants then employed a third attorney, who advised defendants that they were not required to obtain a permit to change the use of their premises to a dance hall and chicken dinner place or to have a permit to make the necessary alterations for that change of purpose. Defendants decided to follow the advice of this attorney (present counsel was not one of these three attorneys) and did, in June of 1944, improve their premises for use as a dance hall. The County Zoning Engineer, learning of this activity, notified defendants that a building permit was necessary to make the alterations they were then making. Defendants on June 6, 1944, then filed an application for a permit for repairs on a building to be used as a chicken dinner restaurant. This application was also denied. Nevertheless, defendants spent $35,000.00 in adapting the building for use as a public dance hall; putting in a concrete floor in the arena in place of the earth floor was a principal item of expenditure. The horse stalls on two sides were also torn out and a concrete slab put there to accommodate tables and chairs for patrons; and celotex and beaver board was put up to improve the appearance of the walls, which were built of rough boards only. In addition, no public sewers being available, defendants installed a septic tank on their property and toilets in the building; made electrical repairs, repaired the roof, made general building repairs and painted the building. The outside ring was used as a parking lot for automobiles and gravel was put on the road leading to it.

Defendants did not pursue the remedy provided in Section 12 (1941 Act) for review after denial of a permit. However, before opening their dance hall, they brought suit against the members of the County Planning and Zoning Board to enjoin them from interfering with the use of their property as a dance hall. Defendants secured a temporary restraining order and under it began the operation of their dance hall in September, 1944. The court, on motion, dissolved the restraining order on October 13, 1944, and defendants' suit was dismissed for want of prosecution on October 27, 1944. Plaintiff commenced the present action November 13, 1944, under authority of Section 15 (1941 Act) permitting such actions by "any persons, the value or use of whose property is or may be affected by such violation" of the Zoning Order. Plaintiff introduced considerable evidence to show the disturbance caused by defendants' operation of the dance hall and how it affected the use plaintiff made of its property.

Section 16 (Zoning Order) provides, in part, as follows: "A nonconforming use, building or structure existing lawfully at the time of the adoption of this Order or any amendment thereof may be maintained, or changed to a conforming use or a non-conforming use of the same or a higher classification, but such non-conforming use building or structure shall not thereafter be: 1. Changed to a use of a lower classification. 2. Expanded. 3. Reestablished if discontinued."

At the trial, there was considerable controversy over whether defendants use of the premises was within the designation "commercial and riding stables", classified as a "D" district use, or whether it was under "stables (public)", classified as an "F" district use. "Dance halls" were classified as an "F" district use. The trial court in its judgment found that "defendants were using their said property for the operation thereon of a public stable as a lawful, non-conforming use under classification District F of Section 11 of said Zoning Order and not as a commercial and riding stable and tracks under classification D of Section 9 of said Order; that under said Zoning Order public stables and dance halls fall within the same classification, namely District F of Section 11." It further found, however, "that when defendants changed the use of their said property from that of a public stable to that of a dance hall in September, 1944, such action was in violation of said Zoning Order, *because the defendants did not first obtain a permit from* ▮▮▮ *the Zoning Engineer to change from the one non-conforming use to the other non-conforming use of the same classification and to effect the interior alterations that were made by defendants in changing such use*; that plaintiff is a property owner, the value or use of whose property is or may be affected by such failure to obtain said permit"; and enjoined further use as a dance hall on that ground. Plaintiff also appealed from this judgment but has dismissed its appeal.

The trial court's judgment is based on Section 11 (1941 Act) which provides: "no building or other structure shall be erected, constructed, reconstructed, enlarged or altered, or repaired in such manner as to prolong the life of the building, *nor shall the use of any land be changed* without first obtaining a permit issued by such officer or official (appointed by the County Court for that purpose) under the provisions of this act" and on Section 21 (Zoning Order) which provides: "No building or other structure shall be erected, constructed, reconstructed, or enlarged, nor shall it be altered in such a manner as to prolong the life of the building, *nor shall the use of any land be changed* without first obtaining a permit from the Zoning Engineer to be issued in accordance with the terms of this Order." (All italics'ours.)

We agree with the view of the trial court stated in a memorandum opinion, as follows: "By the provisions of the Act of 1941 and the County Zoning Order the Zoning Engineer and Board of Zoning Adjustment (referring to the sections hereinabove noted) are in the first instance given authority to determine whether a non-conforming use is 'expanded' before they are required to issue a permit. Their decision is subject to review by the Circuit Court. Hernreich v. Quinn, 168 S. W. (2d) 1054; and Section 12, Laws of 1941, p. 488. Where the zoning regulations expressly permit, within certain limitations, an existing non-conforming use to be changed to another non-conforming use, changes which do not come within the prescribed limitations will be denied. It is the intent and purpose of the Act of 1941, and the County Zoning Order that the Zoning Engineer and Board of Zoning Adjustment determine, in the first instance, whether a change from one non-conforming use to another non-conforming use is within the purview of the Act and Zoning Order. (See annotations contained in 147 A. L. R., p. 167, on changes, after adoption of zoning regulations, in respect to non-conforming existing use.) The permission of the Zoning Engineer or the Board of Zoning Adjustment is a condition precedent under the County Zoning Order before a non-conforming use can be changed to another non-conforming use, even where such other non-conforming use is within the same classification as the original non-conforming use."

Defendants say that "plaintiff's petition proceeded on the sole theory that defendants were changing their lawful non-conforming use to another non-conforming use of a lower classification rather than to one of the same classification"; and that since "the court found that the use was not being changed to one of a lower classification the basis of plaintiff's suit failed." Nevertheless, the petition stated facts concerning the change of use, and neither the Act nor the Zoning Order contains any exception to the requirement of a permit for *any change of use.* We, therefore, hold the petition sufficient to support the judgment.

■ Defendants also contend for the rule of strict construction of zoning laws because they are in derogation of common law. That rule was abolished in this state in 1917. [See Sec. 645 (R. S. 1939) Mo. Stat. Ann.; Laws 1917, p. 324.]

■ Defendants further contend that a permit is required only for structural alterations (defined in the order as "change in the supporting member of a building, such as bearing walls, columns, beams, or girders"); and further argue the impracticability of the application of some of the provisions of the Zoning Order to agricultural lands. However, the permit section of the Zoning Order (Sec. 21), and of the 1941 Act (Sec. 11), does not use the term "structural alterations" as was true in cases cited by defendants [See City of Little Rock v. Williams (Ark.), 177 S. W. (2d) 924]; and their application to agricultural land, which is a different question from changing non-conforming uses, is not involved herein.

■ Of course, zoning laws and regulations must be reasonable in their application to any particular condition or situation. [See Law of Zoning, Metzenbaum, pp. 7, 27, 70, 122 & 130.] We need go no further in this case than to say we think it is undoubtedly reasonable to require a permit for a change of a non-conforming use to another non-conforming use, and for ■ improvements in connection with such change of use, which exceed in cost the original recent purchase price of the entire property; and that such changes at such expense, to make a horse barn, with a dirt floor and rough board siding, into a dance hall with a concrete floor, finished walls and other modern facilities, constitutes an alteration thereof within the meaning of the order, and the Act. (Purchase price of the building and two tracts of land in 1942 was less than $25,000; improvements made in 1944 cost $35,000.) Would it be unreasonable to consider such a complete and expensive addition as this concrete dance floor to be a structure other than a building within the meaning of Section 21 of the Zoning Order? If it were built outside of a building it certainly would be. In any event, we do not need to consider the hypothetical case, put by defendants, of the necessity for a farmer to get a permit to nail a new board on a cow shed. It should be noted that the Zoning Order (Sec. 21) omitted the requirement of a permit for repairs authorized by Section 11 of the Act. It should also be noted that both the Zoning Order (Sec. 24) and the 1941 Act (Sec. 15) provide that, if any section, sub-section, sentence, clause or phrase thereof shall be held invalid, it shall not affect the remaining provisions. It would seem that ample leeway is afforded for essential ordinary repairs in agricultural districts.

■ Defendants finally contend that such an act and order "constitute an unconstitutional deprivation of defendants' property and rights without due process of law." They did not raise this question by answer but say that this was because plaintiff did not claim the

right to injunctive relief on account of failure to obtain a permit to change from one non-conforming use to another non-conforming use of the same classification. Therefore, they say that when the court granted the permanent injunction, basing its action solely on its construction of those provisions as requiring a permit under such circumstances, defendants promptly challenged the constitutionality of those provisions in their motion for new trial, and that such raising of the constitutional question was timely: citing Kristanik v. Chevrolet Motor Co., 335 Mo. 60, 70 S. W. (2d) 890; Beck v. Kansas City Public Service Co. (Mo.), 37 S. W. (2d) 589 and cases therein cited. Their constitutional points are that the discretion vested in the Zoning Engineer to grant or refuse a permit for alterations or for change of use within the same class is a merely arbitrary one, because no standards of guidance or limitation are set up by either the Enabling Act or the Zoning Order; and that where the alterations are to adapt a lawful structure to a use expressly recognized and sanctioned by the Zoning Order, a permit is not reasonably necessary to a proper exercise of the police power invoked for the regulation of the use or real estate under zoning laws. They cite City of St. Louis v. Polar Wave Ice & Fuel Co., 317 Mo. 907, 296 S. W. 993, 54 A. L. R. 1082; Glencoe Lime and Cement Co. v. City of St. Louis, 341 Mo. 689, 108 S. W. (2d) 143; and State of Washington ex rel. Seattle Title Trust Co. v. Roberge, 278 U. S. 116, 73 L. Ed. 210, 49 S. Ct. 50, 86 A. L. R. 654. Under the circumstances of this case, we think we should consider this constitutional question since defendants also make this same argument in support of the construction of the zoning order for which they contend.

Considering the last objection first, we rule that a permit is a reasonable requirement for a change from one non-conforming use to another non-conforming use, regardless of whether the applicant considers it to be within the same class. The necessity for this is well illustrated by the facts of this case. There certainly was considerable basis for dispute as to whether defendants' non-conforming use at the effective date of the Zoning Order was a commercial and riding stable or a public stable, whether or not they were operating a riding academy. (There is no classification of riding academies as such in the order.) The first of these terms was not defined in the order; while a public stable was defined only as "a stable other than a private stable as defined herein." Apparently a public stable did not depend upon its use for boarding horses for others since a private stable was defined as one "with capacity for not more than two horses." (When located on large tracts of land, greater capacity was authorized.) Therefore, a decision on this matter was necessary to determine whether the proposed non-conforming use was in the same or a lower classification as the existing non-conforming use. This depended upon the actual facts as to how the defendants were operat-

ing as well as a construction of the terms used. Likewise, there was the question ▮▮▮ of whether or not the non-conforming use was being expanded. Certainly there was some reasonable basis for finding an expansion of use when improvements were made, which cost $10,000 more than the purchase price of the original building with 13 acres of land, changing the business from one of mainly daytime activity to one carried on during the nighttime, increasing facilities so that ten times the number of people could be accommodated by this new business (more than 1000 attended on one occasion), and also increasing the area used as a parking lot by the use of the outside riding ring and land adjoining for that purpose and constructing a new entrance to it. Increase of volume of business alone is not an expansion of a use, as defendants suggest, but more than that is involved herein.

Some one must determine these and other material questions at the time of change. It cannot be left solely to owners to decide such questions for themselves, because that would make it impossible to keep any record of non-conforming uses. Enforcement of zoning can be made fair and effective only by use of the permit system, under which all non-conforming uses existing at the commencement of zoning and all changes therefrom in such uses can be recorded. Only in this way, can a complete picture of the whole situation be kept always available. We think this was part of the purpose of the Legislature in enacting such provisions; and that their enforcement is essential to the success of such zoning. The zoning engineer is made the officer to receive applications for permits (Sec. 21. Zoning Order) and to decide the right thereto in the first instance. The 1941 Act (Sec. 12) makes ample provisions for complete and adequate review of this decision, both by appeal to the County Board of Zoning Adjustment and then to the Circuit Court. It is well settled that such statutory procedure is the exclusive remedy for review, except as to certain constitutional questions. [State ex rel. Stallman v. Bourke, 345 Mo. 837, 136 S. W. (2d) 326; Hughes v. State Board of Health, 345 Mo. 995, 137 S. W. (2d) 523; Hernreich v. Quinn, 350 Mo. 770, 168 S. W. (2d) 1054; Appeal of Krinks (Pa.), 2 Atl. (2d) 700.] Defendants, failing to avail themselves of such adequate statutory remedy, are in no position to complain about due process of law in this proceeding.

▮▮▮ It is also our view that the zoning engineer is given reasonable standards for determining whether a permit should be issued for alterations prolonging the life of a building, or for change of use, at least so far as non-conforming uses are concerned. Non-conforming uses, existing at the commencement of zoning, are of course permitted to continue as vested rights. [Zoning Law and Practice, Smith—Sec. 85.] However, the theory of zoning is: "Within a period of another twenty years, a large number of such 'non-conforming' uses will have

disappeared, either through the necessity of enlargement and expansion which invariably is forbidden or limited by ordinance, or by the owners realizing that it is unwise and uneconomic to be located in a district which probably is not suitable for the non-conforming purpose, or by obsolescence, destruction by fire or by the elements or similar inability to be used; so that many of these non-conforming uses will 'fade out', with a resulting substantial and definite benefit to all communities.'' [The Law of Zoning, Metzenbaum, p. 288.] Thus it seems reasonable to say that a change from one non-conforming use to another of the same classification is intended only to authorize a changed use which can be carried on with substantially the same facilities utilized for the existing use. [See In re Botz (Mo. App.), 159 S. W. (2d) 367, and State ex rel. Kaegel v. Holekamp (Mo. App.), 151 S. W. (2d) 685.] Therefore, alterations which will prolong or expand a non-conforming use are properly denied.

Furthermore, as pointed out by the trial court, Section 21 of the order (based on Section 11 of the Act) must be read and construed in connection with the specific classification sections of the order (Secs. 6-13 incl.) each of which commence thus: ''No building, structure, land or premises shall be used, and no building or structure shall be hereafter erected, moved, constructed, or altered except for one of the following purposes'': (which are then stated for that class.) It must also be read and construed with Section 16 thereof which prohibits use (and therefore, construing both together, alterations for use) that would change a non-conforming use to another non-conforming use of a lower classification, or which would expand the existing non-conforming use, or result in an expanded use by reason of a change to another non-conforming use of the same class. Thus construed undoubtedly the standard for determining whether a permit should be denied for alterations ''in such manner as to prolong the life of the building'' is whether such alterations would result in prolonging the life of a non-conforming building or structure for a non-conforming use. Certainly, there is no reason of public policy disclosed in the 1941 Act that would prevent prolonging the life of an authorized conforming building. Therefore, the standards applicable to this case are: would the proposed alterations, considering the purpose for which they are made, prolong the term of a non-conforming use; would they expand a non-conforming use; or would they change it to a non-conforming use of a lower classification. Unquestionably, it could reasonably be found that the effect of the alterations herein was to make a more permanent structure than had theretofore existed on the premises. Thus the cases cited by defendants, concerning purely arbitrary decisions, without any standards whatever, are not applicable here.

The judgment is affirmed. All concur.