Carl O. HOFFMANN, Jr., and Mrs. Geraldine St. Denis, Appellants,

v.

Robert KINEALY, Martin Beffa, Clarence Ax, Rudolph Beuc and Leo Maginn, constituting the Board of Adjustment of the City of St. Louis, Missouri, Respondents.

No. 50381.

Supreme Court of Missouri.

En Banc.

May 10, 1965.

Claude W. McElwee, St. Louis, for appellants.

Thos. J. Neenan, City Counselor, John J. Fitzgibbon, Thomas F. McGuire, Assoc. City Counselors, St. Louis, for respondents.

A. P. STONE, Jr., Special Judge.

This is an appeal by Carl O. Hoffmann, Jr., and Mrs. Geraldine St. Denis (herein called relators), the owners of two adjoining lots (frequently referred to as the lots) in the 3100 block of Pennsylvania in the City of St. Louis, from the judgment of the Circuit Court of the City of St. Louis affirming, upon review by certiorari [V.A. M.S. § 89.110], a decision of the board of adjustment sustaining a decision of the building commissioner which denied relators' application for a certificate of occupancy of the lots for a pre-existing lawful nonconforming use, to wit, for the open storage of lumber, building materials and construction equipment.

The lots have an aggregate width of 52½ feet, north and south, are 125 feet deep, east and west, and front on the west side of Pennsylvania, a north-south street, in a block bounded on the east by Pennsylvania, on the north by Juniata, on the west by Minnesota, and on the south by Wyoming. An east-west alley runs along the south side of the lots, and a north-south alley runs along their rear. Portions of the block, i. e., (1) that portion in which the lots are located, which is east of the north-south alley and fronts on Pennsylvania, and (2) that portion south of the east-west alley and fronting on Wyoming, are in a "B" two-family dwelling district, while the remainder of the block, i. e., that portion which is west of the north-south alley (and thus on the opposite side of the alley behind the lots) and fronts on Minnesota is in a "J" industrial district and is used for the operation of a planing mill and for open storage of lumber. A small building housing the general offices of Hoffmann Construction Company, relators' business in connection with which the lots have been used, is located in the "B" two-family dwelling district on the south side of the east-west alley and just across the alley from the lots.

The exhibits presented at the hearing before the board of adjustment, and brought to us with the transcript on appeal, indicate that there are fourteen buildings in the same portion of the block in which the lots are situate, including a tavern on the southwest corner of Pennsylvania and Juniata, one three-family residence, eleven other residences, and at the rear of one residence a building identified on a plat as used for "tractor parts"; ten buildings in that portion of the block south of the east-west alley, including a grocery store on the northwest corner of Pennsylvania and Wyoming, eight residences (all owned by relators), and at the rear of one residence the above-mentioned office building of Hoffmann Construction Company; and that, on the other three corners of the intersection of Pennsylvania and Wyoming, there are two taverns and a cleaning and pressing shop.

Counsel for the city conceded at the hearing before the board of adjustment, and the subsequent finding of the board (not here disputed) was, that the lots were being used at the time of hearing for the open storage of lumber, building materials and construction equipment and that (in the language of the board's finding) "these premises have been used for this same purpose continuously since the year 1910." The front end of the lots is "landscaped" with a hedge and shrubbery, and the area used for open storage is enclosed with a high fence.

The first comprehensive zoning ordinance of the City of St. Louis became effective in 1926. On April 25, 1950, numerous sections of the zoning code were amended by Ordinance 45309. Section 5 A 1 of that ordinance provided that "No building or land shall be used for a use other than those permitted in the district in which such premises are located unless . . . such use existed prior to the effective date of this ordinance." Section 5 B of the same ordinance, insofar as here material, provided that "The use of land within any dwelling district . . . for purposes of open storage . . . which do not conform to the provisions of this ordinance shall be discontinued within six (6) years from the effective date of this ordinance."

About six years and three months later, to wit, on July 24, 1956, Ordinance 48007 was enacted, amending that portion of Section 5 B of Ordinance 45309, with which we are here concerned, to read as follows: "The use of land within any dwelling district for the purpose of open storage is hereby prohibited."

On April 12, 1961, Ordinance 50547 was approved amending Ordinance 45309, as amended, by repealing several sections, including Section 5 thereof, and enacting in lieu thereof several new sections. However, Section 5 A 1 as it appeared in Ordinance 45309 and Section 5 B as it appeared

in Ordinance 48007 were carried forward verbatim in Ordinance 50547.

In May 1961 the provisions of Sections 5 A 1 and 5 B were codified in Sections 903.010 and 903.030 of "The Zoning Code" as a part of "The Revised Code of the City of St. Louis, 1960," in the following language:

Section 903.010. "No building or land shall be used for a use other than those permitted in the district in which such premises are located unless (a) such use is permitted by other provisions of this Chapter or by Chapter 915 (Use, Height, and Area Exceptions) or Chapter 916 (Board of Adjustment); or (b) such use existed prior to April 25, 1950."

Section 903.030. "The use of land within any dwelling district for the purpose of open storage is prohibited."

After relators had been notified on December 7, 1962, to cease the use of the lots for open storage, they filed with the building commissioner on December 21, 1962, an application for a certificate of occupancy of the lots for a pre-existing lawful nonconforming use, to wit, for the open storage of lumber, building materials and construction equipment. From the decision of the building commissioner denying that application, relators appealed to the board of adjustment which, after a public hearing and the taking of evidence, sustained the decision of the building commissioner. Upon review by certiorari, the circuit court accorded the parties a trial on the merits, considered the full record of prior proceedings including exhibits, and affirmed the findings and decision of the board of adjustment.

Relators' petition in the circuit court, upon which the writ of certiorari was issued, charged that Section 903.030 of the zoning code was unconstitutional, null and void and was of no effect as to relators' lots because, by prohibiting continuance of the pre-existing lawful nonconforming use of

the lots, said section would impair, restrict and deprive relators of vested property rights and thereby would take and damage relators' private property for public use without just compensation in violation of Article 1, Section 26, Missouri Constitution of 1945, V.A.M.S. Likewise, that is the essence of relators' complaint upon this appeal.

Respondents' position is that, under the statutory grant of police power in municipal zoning and planning [V.A.M.S. §§ 89.020 and 89.040], the city was empowered to enact on April 25, 1950, Section 5 B of Ordinance 45309, a so-called "amortization" or "toleration" provision which required discontinuance within six years thereafter of the nonconforming use of land within any dwelling district for purposes of open storage, and that, such six-year "amortization" or "toleration" period having run in April 1956, the subsequent absolute prohibition of said nonconforming use of land by Ordinance 48007 enacted on July 24, 1956, thereafter reenacted by Ordinance 50547 on April 12, 1961, and codified in Section 903.-030, was valid.

Relators reply that their right to continue their pre-existing lawful nonconforming use actually was taken, notwithstanding the fact that such taking was delayed, and that the constitutional interdiction against the taking of private property for public use without just compensation [Art. 1, Sec. 26, Mo. Const. of 1945] is absolute and subject to no exception as to a delayed or postponed taking. There has been and is no suggestion that relators' use of their lots constituted a nuisance.

■ The parties thus present, as a matter of first impression in the appellate courts of this state, the constitutionality of the "amortization" or "toleration" technique of eliminating pre-existing lawful nonconforming uses. It may be observed preliminarily that,

although the six-year amortization provision in Section 5 B of Ordinance 45309 enacted in 1950 was not carried forward in Ordinance 48007 enacted in 1956 after the six-year term had run or in the 1960 codification in effect when this proceeding was instituted, we are of the opinion that the validity of Section 903.030 of the 1960 codification should be determined in the light of the 1950 ordinance. 82 C.J.S. Statutes § 386, p. 914; Powell v. Utz, D.C.Wash., 87 F.Supp. 811, 815(6). See State v. Ward, 328 Mo. 658, 668–669, 40 S.W.2d 1074, 1078 (10, 11); Bear Lake & River Waterworks & Irrigation Co. v. Garland, 164 U.S. 1, 4, 11–13, 17 S.Ct. 7, 8, 9, 41 L.Ed. 327, 328, 332. So holding, we proceed to the basic question of constitutionality.

■ Of course, it has long been settled that a comprehensive zoning ordinance operating prospectively, which has a substantial relationship to the public health, safety, morals or general welfare and is not unreasonable or discriminatory, is valid as a proper exercise of the police power. State ex rel. Oliver Cadillac Co. v. Christopher, 317 Mo. 1179, 298 S.W. 720, error dismissed 278 U.S. 662, 49 S.Ct. 17, 73 L.Ed. 569; Village of Euclid v. Ambler Realty Co., 272 Mo. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016. This is so even though, in restricting future uses, any such ordinance may impose hardship and inflict economic loss upon some property owners, for it is recognized that "[e]very valid exercise of the police power is apt to affect the property of some one adversely." Flora Realty & Inv. Co. v. City of Ladue, 362 Mo. 1025, 1040, 246 S.W.2d 771, 779, appeal dismissed 344 U.S. 802, 73 S.Ct. 41, 97 L.Ed. 626; Downing v. City of Joplin, Mo., 312 S.W.2d 81, 85.

In earlier days of zoning legislation, it generally was recognized and conceded that termination of pre-existing lawful nonconforming uses would be unconstitutional.[1]

1. Jones v. City of Los Angeles, 211 Cal. 304, 295 P. 14, 17–18; People v. Miller, 304 N.Y. 105, 106 N.E.2d 34, 35(1);

City of Aurora v. Burns, 319 Ill. 84, 149 N.E. 784, 788–789; Katarincic, Elimination of Non-Conforming Uses, Build-

The expressions by way of *dicta* in our cases suggest that this has been taken for granted in Missouri. In Women's Christian Ass'n. of Kansas City v. Brown, 354 Mo. 700, 709–710, 190 S.W.2d 900, 906, involving an attempted change of nonconforming use from a riding academy to a dance hall, this court said that: *"Nonconforming uses, existing at the commencement of zoning, are of course permitted to continue as vested rights.* Zoning Law and Practice, Smith, § 85." (All emphasis herein is ours.) The Enabling Act, under which the applicable Zoning Order of Jackson County had been enacted, specifically provided that "[t]he powers by this act given shall not be exercised so as to deprive the owner, lessee or tenant, of any existing property of its use or maintenance for the purpose to which it is then lawfully devoted . . ." [Laws of 1941, p. 485], but that statute was not cited in connection with the quoted statement, which was immediately followed by this illuminating commentary upon the theory of zoning: " 'Within a period of another twenty years, a large number of such "nonconforming" uses will have disappeared, either through the necessity of enlargement and expansion which invariably is forbidden or limited by ordinance, or by the owners realizing that it is unwise and uneconomic to be located in a district which probably is not suitable for the nonconforming purpose, or by obsolescence, destruction by fire or by the elements or similar inability to be used; so that many of these nonconforming uses will "fade out," with a resulting substantial and definite benefit to all communities.' The Law of Zoning, Metzenbaum, p. 288."

When the same factual situation was presented a second time in Brown v. Gambrel, 358 Mo. 192, 198, 213 S.W.2d 931, 935(1), this court said, with respect to the prior lawful use of the building as a public stable or riding academy, that *"[s]uch use of such*

*building was a priorly vested right of which the county by the institution* (April 26, 1943) *of its zoning plan could not deprive appellants.* Zoning Law and Practice, Smith, Sec. 85, p. 108; Women's Christian Ass'n. of Kansas City v. Brown, supra; In re Botz, 236 Mo.App. 566, 159 S.W.2d 367; . . . Laws of Missouri, 1941, page 485 . . .."

In State ex rel. Capps v. Bruns, Mo.App., 353 S.W.2d 829, relator sought a writ of mandamus directing issuance to him of a license to operate a junk yard, a pre-existing nonconforming use of his land. The Kansas City Court of Appeals wrote: " 'The *general rule is that nonconforming structures and uses existing at the time of the effective date of a zoning ordinance or restriction may be continued'.* [8] McQuillin, Municipal Corporations, 3d Ed., page 464. *Such use and the operation of such a business was continuance of a vested right of which the city could not deprive plaintiff.* See Brown et al v. Gambrel et al, 358 Mo. 192, 213 S.W.2d 931, 935. In addition, General Ordinance 3162, Sec. 11–21, City of St. Joseph, squarely authorizes such continuing nonconforming use." 353 S.W.2d at 830. Again, the court pointed out: "In our case we have an applicant who for twenty years has conducted a junk yard at this particular location. *He has a vested right which zoning ordinances could not abrogate."* 353 S.W.2d at 831. Later in the opinion, we find this gratuitous observation, without discussion or citation of authority: "Many [?] ordinances limit the life of nonconforming uses to a period of years and such ordinances have been approved. There are apparently no such 'tolerance period' ordinances involved in our case." 353 S.W.2d at 832.

In considering their appellate jurisdiction in Bartholomew v. Board of Zoning Adjustment, Mo.App., 307 S.W.2d 730, 732, the Kansas City Court of Appeals stated:

ings, and Structures by Amortization—Concept v. Law, 2 Duquesne Univ.L.Rev. 1, 2–3 (1963); note, 8 Okla.L.Rev. 239 (1955); note, 9 U.Chi.L.Rev. 477, 483–

484 (1942); 2 Rathkopf, The Law of Zoning and Planning, Ch. 62, p. 62–1 (1960).

"Plaintiffs do not question the general constitutionality of the zoning law. *It is rather their position that under the facts here, they proved a lawful nonconforming use amounting to a vested right, which both constitutions will preserve. If the evidence discloses such proof this court will protect such right and defendants do not contend otherwise.*" These statements from Bartholomew, supra, were quoted with approval by this court in a discussion of appellate jurisdiction in Dunbar v. Board of Zoning Adjustment, Mo., 380 S.W.2d 442, 444, where property owners were complaining of deprivation of "prior vested property rights."

So much for the *dicta* in this state. Obviously, none of the cited Missouri cases reached or ruled the basic question before us here, but they indicate, so we think, that heretofore the validity of pre-existing lawful nonconforming uses has been recognized in this jurisdiction, as elsewhere.

■ Certainly, the spirit of zoning ordinances always has been and still is to diminish and decrease nonconforming uses [Brown v. Gambrel, supra, 358 Mo. at 199, 213 S.W.2d at 935–936; 8 McQuillin, Municipal Corporations (3d Ed.), § 25.183, p. 473], and to that end municipalities have employed various approved regulatory methods such as prohibiting the resumption of a nonconforming use after its abandonment or discontinuance, prohibiting the rebuilding or alteration of nonconforming structures or structures occupied for nonconforming uses, and prohibiting or rigidly restricting a change from one nonconforming use to another. 2 Rathkopf, The Law of Zoning and Planning, Ch. 62, pp. 62–2 to 62–4 (1960). Even so, pre-existing lawful nonconforming uses have not faded out or eliminated themselves as quickly as had been anticipated, so zoning zealots have been casting about for other methods or tech-

niques to hasten the elimination of nonconforming uses. In so doing, only infrequent use has been made of the power of eminent domain, primarily because of the expense of compensating damaged property owners,[2] but increasing emphasis has been placed upon the "amortization" or "tolerance" technique which conveniently bypasses the troublesome element of compensation.

"Stated in its simplest terms, amortization contemplates the compulsory termination of a non-conformity at the expiration of a specified period of time, which period is equaled (sic) to the useful economic life of the non-conformity." Katarincic, Elimination of Non-Conforming Uses, Buildings, and Structures by Amortization—Concept v. Law, 2 Duquesne Univ.L.Rev. 1. "The basic idea is to determine the remaining normal useful life of a pre-existing nonconforming use. The owner is then allowed to continue his use for this period and at the end must either conform or eliminate it." Note, 44 Cornell L.Q. 450, 453 (1959). Courts approving the amortization technique as a valid exercise of the police power rationalize their holdings in this fashion: "The distinction between an ordinance restricting future uses and one requiring the termination of present uses within a reasonable period of time is merely one of degree, and constitutionality depends on the relative importance to be given to the public gain and to the private loss. Zoning as it affects every piece of property is to some extent retroactive in that it applies to property already owned at the time of the effective date of the ordinance. The elimination of existing uses within a reasonable time does not amount to a taking of property nor does it necessarily restrict the use of property so that it cannot be used for any reasonable purpose. Use of a reasonable amortization scheme provides an equitable means of reconciliation of the conflicting interests in satisfaction of due process requirements.

---

2. Katarincic, op. cit. supra note 1, at 4–5; note, 44 Cornell L.Q. 450, 453 (1959); comment, 1951 Wis.L.Rev. 685, 696; note, 102 U.Pa.L.Rev. 91, 93 (1953).

See Grant v. Mayor and City Council of Baltimore, 212 Md. 301, 129 A.2d 363, 365–366.

As a method of eliminating existing nonconforming uses it allows the owner of the nonconforming use, by affording an opportunity to make new plans, at least partially to offset any loss he might suffer. . . . If the amortization period is reasonable the loss to the owner may be small when compared with the benefit to the public." City of Los Angeles v. Gage, 127 Cal.App.2d 442, 274 P.2d 34, 44; Grant v. Mayor and City Council of Baltimore, 212 Md. 301, 129 A.2d 363, 368.

Several cases[3] in other jurisdictions have approved the termination of pre-existing nonconforming uses by the amortization technique. However, there are a number of decisions[4] to the opposite effect, and it may be fairly said that there is "a decided lack of accord" in this area. 58 Am.Jur., Zoning, § 148 (1964–65 Supp., p. 146); annotation 42 A.L.R.2d 1146.

With respect to some of the cases (listed in footnote 3) in which the amortization technique has been employed, brief comments may not be inappropriate. As other courts have observed, the opinions in State ex rel. Dema Realty Co. v. McDonald, 168 La. 172, 121 So. 613, and State ex rel. Dema Realty Co. v. Jacoby, 168 La. 752, 123 So. 314, exhibit "a confusion between the objects of zoning and nuisance regulation" [Jones v. City of Los Angeles, 211 Cal. 304, 295 P. 14, 21; James v. City of Greenville, 227 S.C. 565, 88 S.E.2d 661, 671], and certainly the same properly may be said with respect to Livingston Rock & Gravel Co. v. County of Los Angeles, 43 Cal.2d 121, 272 P.2d 4, where, under a rezoning ordinance providing an "automatic exception" to permit continuance of certain nonconforming uses but authorizing the revocation of any such exception where that could be done without impairment of "constitutional rights," it was found by the planning commission that " 'use of the property with a cement batching plant thereon' was 'being exercised in such a manner as to be detri-

3. State ex rel. Dema Realty Co. v. McDonald, 168 La. 172, 121 So. 613, certiorari denied 280 U.S. 556, 50 S.Ct. 16, 74 L.Ed. 612 (termination of a retail grocery store within one year approved in four to three decision); State ex rel. Dema Realty Co. v. Jacoby, 168 La. 752, 123 So. 314 (termination of "a small retail drug store" within one year approved in six to one decision); Standard Oil Co. v. City of Tallahassee, 5 Cir., 183 F.2d 410, certiorari denied 340 U.S. 892, 71 S.Ct. 208, 95 L.Ed. 647 (discontinuance within ten years of filling station constructed during year prior to enactment of "amortization" ordinance approved in two to one decision); Livingston Rock & Gravel Co. v. County of Los Angeles, 43 Cal.2d 121, 272 P.2d 4 (termination of right to operate cement batching plant within thirteen months approved in four to three decision); City of Los Angeles v. Gage, 127 Cal.App.2d 442, 274 P.2d 34 (termination of wholesale and retail plumbing supply business within five years approved); Harbison v. City of Buffalo, 4 N.Y.2d 553, 176 N.Y.S.2d 598, 152 N.E.2d 42 (discontinuance of junk yard within three years approved in four to three decision); Spurgeon v. Board of Com'rs. of Shawnee County, 181 Kan. 1008, 317 P.2d 798 (discontinuance of automobile wrecking business within two years approved); City of Seattle v. Martin, 54 Wash.2d 541, 342 P.2d 602 (termination within one year of use of vacant lot for repairing construction equipment approved); Grant v. Mayor and City Council of Baltimore, supra, 129 A.2d 363 (removal of billboards, which may be in a somewhat different category, within five years approved).

4. City of Akron v. Chapman, 160 Ohio St. 382, 116 N.E.2d 697, 42 A.L.R.2d 1140 (discontinuance of junk yard within one year disapproved); James v. City of Greenville, 227 S.C. 565, 88 S.E.2d 661 (discontinuance of trailer court within one year disapproved); City of Corpus Christi v. Allen, 152 Tex. 137, 254 S.W. 2d 759 (discontinuance of automobile wrecking yard within one year disapproved); Concord Township v. Cornog, 9 Pa.Dist.Co.R.2d 79, 48 Mun.L.Rev. 202 (Pa.1954) (removal of free-standing advertising signs within six months disapproved). See Jones v. City of Los Angeles, 211 Cal. 304, 295 P. 14; O'Connor v. City of Moscow, 69 Idaho 37, 202 P. 2d 401, 9 A.L.R.2d 1031; Stoner McCray System v. City of Des Moines, 247 Iowa 1313, 78 N.W.2d 843, 58 A.L.R.2d 1304; Town of Somers v. Camarco, 308 N.Y. 537, 127 N.E.2d 327.

mental to public health, and so as to be a nuisance.'" 272 P.2d at 7. Referring to the Dema Realty Company cases, supra, one writer has offered this caustic criticism: "The Louisiana decisions in this field . . sound more like Cossack interpretations of Muscovite ukases than utterances of a court operating under the benign provisions of the Magna Carta." Fratcher, Constitutional Law—Zoning Ordinances Prohibiting Repair of Existing Structures, 35 Mich.L.Rev. 642, 644 (1937). And in Grant v. Mayor and City Council of Baltimore, supra, 129 A.2d at 367, it was frankly conceded that the opinions in the Dema Realty Company cases, supra, and in Standard Oil Co. v. City of Tallahassee, 5 Cir., 183 F.2d 410, were "not particularly persuasive in their reasoning," although the court was "impressed" with the decisions in Livingston Rock & Gravel Co. v. County of Los Angeles, supra, and City of Los Angeles v. Gage, supra. With respect to Standard Oil Co. v. City of Tallahassee, supra, a perspicacious student has pointed out that: "Discontinuance was required in spite of the fact that many 'of the residences [in the area] are far below standard and many of them shacks. . . .' [87 F.Supp. 145, 149 (D.C.Fla.1949)] Thus, it would seem, the court was sanctioning the use of 'amortization' provisions to redevelop an unsightly area." Note, 44 Cornell L.Q. 450, 455 (1959).

In Harbison v. City of Buffalo, 4 N.Y.2d 553, 176 N.Y.S.2d 598, 152 N.E.2d 42, frequently cited by advocates of the amortization technique, only two judges concurred in the principal opinion while the additional two included in the bare majority of four concurred in result "upon the principles stated in People v. Miller, 304 N.Y. 105, 108, 109, 106 N.E.2d 34, 35, 36." 176 N.Y.S.2d at 616, 152 N.E.2d at 54. The "principles stated" in People v. Miller, supra, were that

"nonconforming uses or structures, in existence when a zoning ordinance is enacted, are, as a general rule, constitutionally protected and will be permitted to continue, notwithstanding the contrary provisions of the ordinance" [106 N.E.2d at 35(1)]; that, however, "the enforcement of a zoning regulation against a prior nonconforming use will be sustained where the resulting loss to the owner is relatively slight and insubstantial" [106 N.E.2d at 35(3)]; that the principle permitting continuance of pre-existing nonconforming uses was "clearly inapplicable to a purely incidental use of property for recreational or amusement purposes only"; and that "an inconsequential use as that here involved—the harboring of pigeons as a hobby—[did] not amount to a 'vested right'" protected against termination by an amended zoning ordinance. 106 N.E.2d at 36. The author of a comprehensive note on Harbison v. City of Buffalo, supra, appropriately suggests that, since two of the four judges constituting the majority in that case concurred only in result on the basis of People v. Miller, supra, "it is doubtful if the Court of Appeals as a whole intended to move too far away from that decision and its fundamental principle that a prior nonconforming use can be terminated only where it is insubstantial." Note, 44 Cornell L.Q. 450, 457.

But, although the holdings in other jurisdictions may, in some instances, be enlightening and persuasive, it is neither our duty nor our inclination to rule a question of first impression in this state simply by counting foreign cases and then falling off the judicial fence on the side on which more cases can be found. Rather, our concern should be and is to determine the basic constitutional right of the matter, as we see it. Property is defined as including not only ownership and possession but also the right of use and enjoyment for lawful purposes.[5] In fact, "[t]he substantial value of property

---

5. Terrace v. Thompson, 263 U.S. 197, 215, 44 S.Ct. 15, 17–18, 68 L.Ed. 255, 274; City of Akron v. Chapman, supra note 4, 116 N.E.2d at 700; O'Connor v. City of Moscow, supra note 4, 202 P.2d at 404(3); Spann v. City of Dallas, 111 Tex. 350, 235 S.W. 513, 514(1), 19 A.L.R. 1387.

lies in its use." [6] It follows that: "'[t]he constitutional guaranty of protection for all private property extends equally to the enjoyment and the possession of lands. An arbitrary interference by the government, or by its authority, with the reasonable enjoyment of private lands is a taking of private property without due process of law, which is inhibited by the Constitution.' Tiedeman's Limitation of Police Powers, § 122." Ex parte Davis, 321 Mo. 370, 375, 13 S.W.2d 40, 41. See 1 Lewis, Eminent Domain (3d Ed.), § 65, p. 56.

■ Counsel for instant respondents would support and justify the amortization provision under consideration as constituting reasonable and permissible *regulation* of the use of property. Of course, every comprehensive zoning ordinance limits and thereby regulates the use of property prospectively. But we cannot embrace the doctrine espoused by advocates of the amortization technique that there is no material distinction between regulating the future use of property and terminating pre-existing lawful nonconforming uses.

■ The amortization provision under review would terminate and take from instant relators the right to continue a lawful nonconforming use of their lots which has been exercised and enjoyed since 1910— a right of the character to which the courts traditionally have referred as a "vested right." [7] To our knowledge, no one has, as yet, been so brash as to contend that such a pre-existing lawful nonconforming use properly might be terminated *immediately*. In fact, the contrary is implicit in the amortization technique itself which would validate a taking *presently* unconstitutional by the simple expedient of *postponing* such

taking for a "reasonable" time. All of this leads us to suggest, as did the three dissenting justices in Harbison v. City of Buffalo, supra, 152 N.E.2d at 49, that it would be a strange and novel doctrine indeed which would approve a municipality taking private property for public use without compensation if the property was not too valuable and the taking was not too soon, and prompts us to repeat the caveat of Mr. Justice Holmes in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 416, 43 S.Ct. 158, 160, 67 L.Ed. 322, 326, 28 A.L.R. 1321, that "[w]e are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." In this connection, we note also the terse comment of Chief Judge Hutcheson dissenting in Standard Oil Co. v. City of Tallahassee, supra, 183 F.2d at 414, "that even in this age of enlightenment the Constitution still protects the citizen against arbitrary and unreasonable action" and that the majority opinion in that case left him "in no doubt" but that "a good general principle, the public interest in zoning, [had] been run into the ground, the tail of legislative confiscation by caprice [had] been permitted to wag the dog of judicial constitutional protection."

■ It has been suggested that perhaps some distinction should be made between the termination of pre-existing nonconforming uses of *land* and the termination of such uses of *buildings*, and that it might be constitutionally permissible to terminate uses in the first category but not in the second. However, such distinction would be not only illogical but also in utter disregard of the economic realities of modern urban life, for

6. City of Akron v. Chapman, supra note 4, 116 N.E.2d at 700; Spann v. City of Dallas, supra note 5, 235 S.W. at 514–515; O'Connor v. City of Moscow, supra note 4, 202 P.2d at 404.

7. Women's Christian Ass'n. of Kansas City v. Brown, 354 Mo. 700, 709, 190 S.W.2d 900, 906; Brown v. Gambrel, 358

Mo. 192, 213 S.W.2d 931, 935; State ex rel. Capps v. Bruns, Mo.App., 353 S.W. 2d 829, 830, 831; Bartholomew v. Board of Zoning Adjustment, Mo.App., 307 S.W. 2d 730, 732; Des Jardin v. Town of Greenfield, 262 Wis. 43, 53 N.W.2d 784, 787(1); Richards v. City of Pontiac, 305 Mich. 666, 9 N.W.2d 885, 888(7).

the use of vacant land often is more valuable than the use of buildings. E. g., older buildings frequently are torn down to make the underlying land available for more profitable uses such as used car lots or parking lots. In City of Seattle v. Martin, 54 Wash.2d 541, 342 P.2d 602 (1959), involving an ordinance which limited application of the amortization technique to nonconforming uses of vacant land, defendant's counsel, in his unavailing plea of unconstitutionality, with understandable cynicism pointed out that: "A watchmaker in a $400.00 building could continue [a pre-existing nonconforming use]. A used car lot or a parking lot with no office would have to stop. If [defendant] had a $100.00 office building perhaps [he] could continue. Such distinctions are not reasonable." Katarincic, op. cit. supra, at p. 34. And the commentator, although of the amortization school, observes in the same vein as defendant's counsel that limitation of the ordinance to nonconforming uses of vacant land "suggests that the ordinance was motivated by aesthetic considerations" and that "[i]t would be difficult to imagine that a use would become any less or more compatible if it takes place in or outside a building." Katarincic, op. cit. supra, at p. 34.

In a bold, critical student note inspired by City of Seattle v. Martin, supra, the author thought that the decision in that case might "seem mild in view of the facts of the case" and the attitude of some courts as exemplified by the comment of the Supreme Court of Louisiana in State ex rel. Dema Realty Co. v. Jacoby, supra, 123 So. at 317, that "[d]efendant's drug store is a small one, and it is obvious that one year affords ample time within which to liquidate the business and close it." Note, 35 Wash.L.Rev. 213, 218 (1960). But, as the author continued, it is important that the courts be aware of the direction in which the amortization technique takes them. "There are small drug stores, small junk yards, and small department stores. 'Small' is a relative term, and the generally proposed test of balancing the hardship on the individual with the benefit

to the public is capable of extension to bigger businesses and property investments. . . . Might not the test of the Martin case disclose that the public benefit in attracting industry and locating it in a well planned and desirable section of the city outweigh the hardship on the farmer who has to leave—especially if it is only a 'small' farm? . . . Whatever the policy result desired, would it not be better that our court clearly articulate its policy reasoning and at least compensate a property owner for a taking of his rights?" Note, 35 Wash.L. Rev. at 218–219.

In declining to adopt the suggestion that there may be some valid distinction between the termination of pre-existing lawful nonconforming uses of land and the termination of such uses of buildings, we have not overlooked the discussion in the case of In re Botz, 236 Mo.App. 566, 159 S.W.2d 367, which did *not* concern the termination of pre-existing lawful nonconforming uses by the amortization technique but which pertained only to a provision of the then effective St. Louis zoning ordinance permitting the owner of a *building* to change from one pre-existing lawful nonconforming use "to another nonconforming use of the same or a more restricted classification," if no structural alterations were made. 236 Mo.App. at 574, 159 S.W.2d at 371. That the court, by way of *dicta,* thought it reasonable that the Board of Aldermen had not seen fit to extend to owners of *land* the same right to change from one nonconforming use to another is not, to us, persuasive here.

Although the record before us leaves much to be desired by way of detail, it is sufficient for the purposes of this opinion to say that the record adequately shows that instant relators' use of their lots may not be brushed aside and disregarded as "relatively slight and insubstantial." Contrast People v. Miller, supra, 106 N.E.2d at 35, 36, involving the harboring of pigeons as a hobby. In our view of the matter, termination of relators' pre-existing lawful nonconforming use of their lots for the open

storage of lumber, building materials and construction equipment would constitute the taking of private property for public use without just compensation in violation of Article 1, Section 26, Missouri Constitution of 1945—a taking not to be justified as an exercise of the police power which is always subject to, and may never transcend, constitutional rights and limitations. Panhandle Eastern Pipe Line Co. v. State Highway Com'n. of Kansas, 294 U.S. 613, 622, 55 S.Ct. 563, 567, 79 L.Ed. 1090, 1097, rehearing denied 295 U.S. 768, 55 S.Ct. 652, 79 L. Ed. 1709; Women's Kansas City St. Andrew Soc. v. Kansas City, Mo., 8 Cir., 58 F.2d 593, 598(3); James v. City of Greenville, 227 S.C. 565, 88 S.E.2d 661, 668; Connor v. Township of Chanhassen, 249 Minn. 205, 81 N.W.2d 789, 797(19); 16 C.J.S. Constitutional Law § 196, pp. 946–951.

Accordingly, the judgment of the circuit court is set aside and the cause is remanded with directions to enter judgment ordering respondents, constituting the board of adjustment of the City of St. Louis, to issue, or cause to be issued, to relators a certificate of occupancy for continuance of the pre-existing lawful nonconforming use of relators' lots for the open storage of lumber, building materials and construction equipment.

All concur, except HYDE, J., who dissents in separate dissenting opinion filed.

HYDE, Judge (dissenting).

I respectfully dissent from the opinion of Stone, Special Judge, herein and state the following views as to the situation involved. All that is involved in this case is whether the City may prohibit open storage on vacant land in residence districts after allowing a six-year period for discontinuance. My view is that this is a reasonable exercise of the police power. It is well established that the test of validity of the exercise of the police power is reasonableness, 11 Am.Jur. 1073 et seq., Constitutional Law, Secs. 302–307; 16 C.

J.S. Constitutional Law, § 198, p. 951. All zoning is based on reasonable exercise of the police power; that is, it must have a reasonable relation to public health, safety or welfare.

In the leading case of Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 115, 71 L.Ed. 303, the Court said that zoning and "all similar laws and regulations, must find their justification in some aspect of the police power, asserted for the public welfare." The court pointed out the following reasons for this use of the police power: "[T]he segregation of residential, business and industrial buildings will make it easier to provide fire apparatus suitable for the character and intensity of the development in each section; that it will increase the safety and security of home life, greatly tend to prevent street accidents, especially to children, by reducing the traffic and resulting confusion in residential sections, decrease noise and other conditions which produce or intensify nervous disorders, preserve a more favorable environment in which to rear children."

The court also stated: "Until recent years, urban life was comparatively simple; but, with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for, while the

meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world it is impossible that it should be otherwise."

In view of these applicable principles, it does not seem reasonable to say that the existence of a particular use of vacant land when a zoning ordinance is adopted gives the owner a vested right to continue it in perpetuity, especially the right to pile material on vacant ground. The St. Louis Court of Appeals In re Botz, 236 Mo.App. 566, 159 S.W.2d 367, 372, points out sound reasons for making a distinction between land and buildings in permitting a nonconforming use, saying: "A building represents an investment in the improvement of the land upon which it is erected; and if regard were not had for the reasonable protection of such investment, then the ordinance would frequently be confiscatory with respect to its application to particular structures. Not only is a building erected with a view to its adaptation to a specific form of use which is to be made of it, but it is often difficult, if not impossible, to convert it to an entirely different form of use. Consequently, where the building is only adaptable to nonconforming uses, the ordinance grants the special privilege, where no structural alterations are involved, of changing from one nonconforming use to another of the same or a more restricted classification, and also allows the recommencement of a definite nonconforming use which has been previously discontinued. Not so, however, in the case of land, where the owner has made no investment in its improvement, and where, in most instances, he would be expected to suffer no hardship if compelled to conform to the strict letter of the zoning plan with respect to the use to which his land might be subjected."

The landmark opinion of this Court, State ex rel. Oliver Cadillac Co. v. Christopher, 317 Mo. 1179, 298 S.W. 720, upheld zoning in this state for the first time as a valid exercise of the police power and held the zoning regulations established for the City of St. Louis were not arbitrary and unreasonable. The dissenting opinion therein made the following argument: "The present opinion extends the police power to the destruction of private property and private rights. Under its definition of police power, there is no limit to the taking of property. Under its broad doctrine of police power, the city authorities could take the whole of a person's property, if it so desired, and that too without a cent of compensation. If the police power authorizes the taking of a part of the property for public use, by the same token, title as well as use of the property could be taken." This is essentially the same argument made by appellants in this case.

As pointed out in City of Los Angeles v. Gage, 127 Cal.App.2d 442, 274 P.2d 34, 44, as follows: "The distinction between an ordinance restricting future uses and one requiring the termination of present uses within a reasonable period of time *is merely one of degree,* and constitutionality depends on the relative importance to be given to the public gain and to the private loss. Zoning as it affects every piece of property is to some extent retroactive in that it applies to property already owned at the time of the effective date of the ordinance."

It is not necessary in this case to consider any amortization principal as to buildings or even land without buildings which has been improved for a particular use such as a paved parking lot. Prohibiting use of vacant unimproved land in residential districts for open storage seems to me to be a very different situation from removal or abandonment of use of buildings or other improvements on land. It requires no destruction or costly conversion of buildings but only finding another location for the stored material and hauling it away. This may be a matter of degree but degree is a material consideration in determining reasonableness of the exercise of police power.

High piles of stored material are not conducive to the maintenance or development of a good residential environment not only because they are unsightly but also because they could provide a lurking place for thieves and other criminals and also could attract children who might be injured playing there. See Hull v. Gillioz, 344 Mo. 1227, 130 S.W.2d 623, 627, and cases cited. While such open storage has not been classified as a nuisance, it thus has some of the undesirable characteristics of nuisance in a residential district. See 84 A.L.R.2d 654 and cases cited which have applied nuisance principles to a lawful business not a nuisance per se because of location in a residential district. Therefore, I would hold the ordinance in this case, for termination of open storage in residential districts after six years, a reasonable exercise of the police power and valid.