ADAMS OUTDOOR ADVERTISING v CITY OF EAST LANSING

Docket No. 200655. Submitted May 5, 1998, at Grand Rapids. Decided November 20, 1998, at 9:20 A.M. Leave to appeal sought.

Adams Outdoor Advertising and others brought an action in the Ingham Circuit Court against the city of East Lansing, seeking declaratory and injunctive relief with regard to a provision of the city's sign code that required the removal of nonconforming signs within a specified amount of time and did not provide for the payment of any compensation to Adams for the removal of its nonconforming signs. The court, Thomas L. Brown, J., granted Adams' motion for partial summary disposition, finding that the contested provision was enacted without legislative authority. The city appealed and the Court of Appeals affirmed in an unpublished opinion per curiam, decided April 20, 1990 (Docket Nos. 110816-110818). The Supreme Court reversed the decision of the Court of Appeals, finding the city had the authority to enact its sign code, including the disputed provision. The Court remanded the matter to the trial court to resolve the issue whether the enforcement of the provision resulted in a taking without just compensation. 439 Mich 209 (1992). On remand, the court ruled that, with regard to Adams' billboards located on rooftop leaseholds, the enforcement of the provision resulted in a taking because Adams was deprived of all economically viable use of the property. With respect to the freestanding billboards in dispute that are located on property owned by Adams, the court ruled that there was a taking and permanently enjoined the city from enforcing the disputed provision against Adams. The court determined the amount of Adams' loss with respect to both the rooftop and freestanding billboards. The city appealed.

The Court of Appeals held:

1. The property interests involved in this matter, whether leasehold or fee simple, are real property interests.

2. Even though the city has the legislative authority to enact its sign code and even though the sign code has a valid police power purpose, if the code goes too far in regulating Adams' use of its real property, a taking for which compensation is due will be recognized.

3. As applied to Adams' billboards, the enforcement of the disputed provision constitutes a taking regardless of whether Adams was given a reasonable time to comply with the code and recover a substantial return on its investment.

4. It is realistic and fair to consider each of Adams' real property interests separately for purposes of the taking analysis.

5. The court properly found that the disputed provision, as applied to Adams' rooftop leaseholds, constituted a categorical taking that deprived Adams of all economically beneficial use of the leasehold. The city does not dispute the method used to value the rooftop leaseholds. The order of the trial court must be affirmed with respect to the rooftop billboards.

6. The court, for purposes of determining whether the enforcement of the disputed provision with regard to the freestanding billboards constituted a taking, should have engaged in an ad hoc factual inquiry centering on three factors: the character of the government's action, the economic effect of the regulation on the property, and the extent by which the regulation has interfered with distinct investment-backed expectations. The question whether the regulation denies the owner economically viable use of the land requires at least a comparison of the value removed with the value that remains. The court considered only the second factor, and only in a limited manner, and made a finding regarding the value removed but not the value remaining.

7. The order with respect to the freestanding billboards must be reversed and the matter must be remanded for a calculation of the value remaining and a reevaluation of the taking claim under the three-part balancing test.

Affirmed in part, reversed in part, and remanded.

1. CONSTITUTIONAL LAW — MUNICIPAL CORPORATIONS — LAND USE REGULATIONS — TAKINGS — COMPENSATION.

A taking may be found where a land use regulation denies an owner economically viable use of the land; a taking for which compensation is due will be recognized where a land use regulation goes too far in regulating an owner's use of real property, even if the regulation is enacted pursuant to legislative authority and has a valid police power purpose.

2. CONSTITUTIONAL LAW — MUNICIPAL CORPORATIONS — SIGN CODES — TAKINGS — COMPENSATION.

Enforcement of a municipal sign code that provides that any existing signs on the effective date of the code or any amendment thereto that does not at that time comply with all the code provisions or

amendments thereto shall not be placed, maintained, or displayed after a certain future date may result in a taking for which compensation may be due even though the code gives the sign owner a reasonable period to comply with the ordinance and recover a substantial return on the owner's investment.

3. CONSTITUTIONAL LAW — MUNICIPAL CORPORATIONS — REAL PROPERTY — TAKINGS.

The government may effectively "take" a person's property by overburdening it with regulations; land use regulations effectuate a taking in two general situations: where the regulation does not substantially advance a legitimate state interest or where it denies an owner economically viable use of the land; the latter situation is further subdivided into categorical takings, where the owner is deprived of all economically beneficial or productive use of the land and should automatically recover for the taking, or a taking recognized on the basis of the traditional balancing test whereby a reviewing court must engage in an ad hoc, factual inquiry centering on three factors: the character of the government's action, the economic effect of the regulation on the property, and the extent by which the regulation has interfered with distinct investment-backed expectations; although there is no set formula for determining when a taking has occurred under the balancing test, the question whether the regulation denies the owner economically viable use of the land requires at least a comparison of the value removed with the value that remains.

*Fraser Trebilcock Davis & Foster, P.C.* (by *Michael H. Perry*), for Adams Outdoor Advertising.

*McGinty, Jakubiak, Frankland, Hitch & Henderson, P.C.* (by *Thomas M. Hitch*), for the city of East Lansing.

Amicus Curiae:

*Bodman, Longley & Dahling LLP* (by *James J. Walsh*), for Outdoor Advertising Association of Michigan.

Before: SAWYER, P.J., and KELLY and SMOLENSKI, JJ.

SMOLENSKI, J. Defendant city of East Lansing appeals as of right a final order granting declaratory and injunctive relief in favor of plaintiff Adams Outdoor Advertising. We affirm in part, reverse in part, and remand.

Adams is a company engaged in the business of owning off-premises billboards[1] and leasing the space on these billboards for advertising purposes. In East Lansing, Adams has billboards placed at three different locations. Specifically, at 111 North Harrison and 1108 East Grand River, Adams has three and two, respectively, billboards located on building rooftops pursuant to leases. And, on a narrow strip of property owned by Adams at 1502 West Grand River (the Point), Adams has a total of seven sign faces on five freestanding billboards. All the free-standing billboards at the Point measure twelve feet by twenty-five feet (three hundred square feet) except for one "rotary" or "bulletin" billboard, which measures fourteen feet by forty-eight feet.

In 1975, East Lansing adopted a comprehensive sign code. Under the code, Adams' previously lawful rooftop and freestanding billboards became nonconforming. Specifically, Adams' rooftop billboards were prohibited by the code. The seven sign faces at the Point exceeded the number of signs permitted at this location under the code and violated the code's spacing and setback requirements. In addition, the rotary billboard at the Point exceeded the code's height and three hundred square foot maximum display area

---

[1] Off-premises billboards direct attention to a use, business, commodity, service, or activity not conducted, sold, or offered upon the premises where the signs are located. See *Adams Outdoor Advertising v East Lansing*, 439 Mich 209, 213-214; 483 NW2d 38 (1992) (*Adams I*).

requirements. Subsection 8.39(8) of the code, as subsequently amended, gave Adams until May 1, 1987, to eliminate its nonconforming signs:[2]

> 8.39 *Alterations to Signs.* Any existing sign on the effective date of this Chapter or any amendment hereto, which does not at that time comply with all of the provisions hereof, including any amendment:
>
> \*     \*     \*
>
> (8) Shall not be placed, maintained, or displayed by any person on or after May 1, 1987.

The code did not provide for the payment of any compensation for the removal of Adams' nonconforming billboards.

In early 1987, East Lansing informed Adams that it would be cited for a violation if its nonconforming signs were still in place after the May 1, 1987, deadline. After Adams applied for and was denied a variance by East Lansing's Building Board of Appeals, Adams and others filed suit against East Lansing, seeking declaratory and injunctive relief.

---

[2] The "elimination of nonconforming uses and structures over a specified period of time is commonly referred to as 'amortization.' " *Adams I,* n 1, *supra* at 216, n 12. One court observed as follows with respect to the use of the term "amortization" to describe such an ordinance:

> The ordinance here requires that nonconforming signs must be removed or brought into conformance within a specified period of time after they become nonconforming. This is referred to as "amortization," but in reality it is no more than notice to the owner and user of the sign that they have a period of time to make whatever adjustments or other arrangements they can. This is probably not a proper use of the word "amortization," and so used it contains no connotation of compensation or a requirement therefor. [*Art Neon Co v City & Co of Denver,* 488 F2d 118, 121 (CA 10, 1973).]

As relevant to this case, Adams contended that subsection 8.39(8) was enacted without statutory authority and constituted a taking without just compensation. The trial court subsequently found that subsection 8.39(8) was enacted without legislative authority and granted Adams' motion for partial summary disposition. This Court affirmed. *Adams Outdoor Advertising v East Lansing*, unpublished opinion per curiam, decided April 20, 1990 (Docket Nos. 110816-110818).

In *Adams Outdoor Advertising v East Lansing*, 439 Mich 209, 212, 219; 483 NW2d 38 (1992) (*Adams I*), our Supreme Court reversed the decision of this Court on the ground that East Lansing had the authority under subsection 4i(5) of the home rule city act, MCL 117.4i(5); MSA 5.2082(5),[3] to enact its sign code, including subsection 8.39(8). The Court remanded to the trial court to resolve the taking issue.

On remand, the taking issue proceeded to a trial. At the outset of the trial, the court initially ruled that subsection 8.39(8), as applied to Adams' rooftop billboards, constituted a taking because Adams was deprived "of all economically viable use of the property . . . ." The court ruled that it would defer its ruling with respect to Adams' freestanding billboards at the Point until it heard the evidence with respect to the amount of economic loss that Adams would sustain at this location as a result of complying with the sign code.

Although emphasizing that East Lansing had not offered to pay any compensation and that Adams was

---

[3] Redesignated as MCL 117.4i(f); MSA 5.2082(f) by 1991 PA 175.

not seeking any compensation but, rather, was seeking a ruling regarding the enforceability of subsection 8.39(8), Adams offered the testimony of an expert in the appraisal of off-premises billboards for the purpose of establishing the amount of economic loss that it would sustain. Adams' expert testified that he had used the income capitalization method to arrive at an estimated value of each of Adams' three sign locations in East Lansing as of November 1996. With respect to the Point, the expert testified that he estimated that the present gross income for the seven sign faces at the Point was approximately $64,500, with a significant portion of this figure (approximately $33,000) attributable to the income produced by the rotary billboard. The expert testified that he understood that under the code Adams would still be permitted to maintain four sign faces at the Point. The expert testified that in going from seven sign faces to four sign faces Adams would lose approximately $44,500 in gross income, which, after applying a 32.6 percent expense ratio (approximately $14,500 in estimated expenses), yielded a loss of $30,000 in net income. The expert testified that $30,000 net income capitalized at a ten percent rate of return yielded an estimated loss at the Point of $300,000. The expert testified that he estimated that the value of the losses that Adams would incur at 111 North Harrison and 1108 East Grand River was $57,500 and $55,000 respectively.

Following the proofs, the court ruled that subsection 8.39(8), as applied to the billboards located at the Point, constituted a taking. Reducing the capitaliza-

tion rate from ten percent to seven percent,[4] the court determined that the loss to Adams at the Point, 111 North Harrison, and 1108 East Grand River was $200,000, $40,250, and $38,500, respectively. The court subsequently entered a final order (1) declaring that subsection 8.39(8), as applied to Adams' billboards, constituted a taking of Adams' property without just compensation in violation of the United States and Michigan Constitutions, and (2) permanently enjoining East Lansing from enforcing subsection 8.39(8) against Adams. East Lansing appeals as of right from this order.

On appeal, East Lansing raises numerous grounds in support of its contention that the trial court erred in determining that subsection 8.39(8), as applied to Adams' billboards, constitutes a taking. Specifically, East Lansing argues that no taking has occurred because the billboards are personal property and the United States Supreme Court has recognized that "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [an owner] ought to be aware of the possibility that new regulation might even render his property economically worthless . . . ." *Lucas v South Carolina Coastal Council*, 505 US 1003, 1027-1028; 112 S Ct 2886; 120 L Ed 2d 798 (1992). This argument demonstrates the importance of precisely identifying the property interest claimed to have been taken.

In *In re Acquisition of Billboard Leases & Easements*, 205 Mich App 659, 661; 517 NW2d 872 (1994),

---

[4] The court explained that Adams' expert had indicated that the ten percent rate was comprised of seven percent for income stream and three percent for risk factors. In reducing the capitalization rate from ten percent to seven percent, the court stated that no risk existed in this case.

governmental entities had condemned not only billboards but also leaseholds on which the billboards were located. The issue on appeal to this Court was the determination of just compensation for these property interests. *Id.* With respect to the condemned billboards, there was no dispute that just compensation was owed for their full value, and the parties apparently agreed that "this can be determined by estimating the cost of the billboards as 'new less depreciation.'" *Id.* at 661, n 1. With respect to the leaseholds on which the billboards were located, this Court recognized that "[r]egardless of whether a billboard is classified as personal property or a fixture, the leaseholds and air rights that were taken from defendants are real property. This Court has previously held that income capitalization is a proper method of estimating the value of income-producing real property." *Id.* at 662.

In Adams' trial brief in this case, Adams specifically relied on *Acquisition of Leases* for its assertions that the billboards were income-producing real property and that the income capitalization method was the proper method for determining the value of this property. At the outset of the trial, the court ruled as follows:

> The Court finds no merit to Defendant's assertion that there is no right to compensation for leasehold interests such as those possessed by Adams Outdoor Advertising. . . .
>
> As to the proper method of calculating the amount of compensation, the Court finds that the income capitalization method, that is the present value [sic] the future cash flows, is the proper method to be employed.

In light of these rulings and this Court's decision in *Acquisition of Leases, supra,* Adams then successfully moved to have excluded from evidence exhibits pertaining to the cost and depreciation of the billboards, which, we note, would be relevant in establishing the value of the billboards themselves. See *Acquisition of Leases, supra* at 661, n 1.

Thus, despite whatever imprecise characterizations have been used in this case, i.e., that the property taken by subsection 8.39(8) is Adams' "billboards," a review of the record makes it abundantly clear that this case was tried on the theory that the property interests claimed to have been taken by East Lansing's sign code are Adams' real property interests, whether leasehold or fee simple, in the places where its billboards are located. East Lansing's argument that no taking occurred because the billboards are personal property misapprehends the nature of the property interests claimed to have been taken in this case and is therefore rejected.

Next, East Lansing contends that our Supreme Court's decision in *Adams I* makes clear that its power to regulate billboards under the home rule city act is not limited to the same extent that its power to zone is restricted under the zoning enabling act, MCL 125.581 *et seq.*; MSA 5.2931 *et seq.,* with respect to nonconforming uses. We agree. See *Adams I, supra* at 216-217. East Lansing also contends that its sign code, which was enacted for safety and aesthetic reasons, is a valid exercise of its police power and that Adams is not immune from these ordinances. Again, we have no quarrel with this proposition. See *Queenside Hills Realty Co, Inc v Saxl,* 328 US 80, 83; 66 S Ct 850; 90 L Ed 1096 (1946). East Lansing thus con-

cludes that it can enforce its sign code against Adams even if it means the complete elimination of off-premises advertising and that no claim of a taking can be sustained. We cannot agree with this conclusion. Rather, " '[t]he general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.' " *K&K Constr, Inc v Dep't of Natural Resources*, 456 Mich 570, 576; 575 NW2d 531 (1998)  (quoting *Pennsylvania Coal Co v Mahon*, 260 US 393, 415; 43 S Ct 158; 67 L Ed 322 [1922]).  More specifically, even if a land use regulation substantially advances a legitimate state interest, a taking may be found where "the regulation denies an owner economically viable use of his land." *K&K, supra* at 576. Thus, we reject East Lansing's argument that it can enforce its sign code against Adams and no claim of a taking can be maintained. In other words, even though East Lansing has the legislative authority to enact its sign code and even though the code has a valid police power purpose, if the code goes too far in regulating Adams' use of its real property, a taking for which compensation is due will be recognized. *K&K, supra.*

Next, East Lansing contends that subsection 8.39(8) does not constitute a taking as applied to Adams' signs because Adams was given a reasonable period to comply with the sign code and recover its investment. In making this argument, East Lansing relies on *Art Neon Co v City & Co of Denver*, 488 F2d 118 (CA 10, 1973),  and other cases that have found that ordinances analogous to subsection 8.39(8) do not constitute a taking of property without just compensation. However, in *Adams I, supra* at 234-237, Justice LEVIN,

in a separate opinion, rejected the rationale of these cases:

> The courts approving amortization[5] as a reasonable imposition on private property rights have based their conclusions upon policy arguments of dubious merit. Further, the authorities to the contrary, while less numerous, are more persuasive.
>
> Authorities holding that amortization is constitutionally permissible invariably begin by acknowledging the principle that nonconforming uses are not subject to immediate termination.[6] Zoning enactments have traditionally been prospective in effect, partly in the expectation, it has been said, "that existing nonconforming uses would be of little consequence and . . . would eventually disappear." But, as a commentator observed, "the number of nonconforming uses did not decrease, but rather increased due to indifferent or unsympathetic administration of the zoning ordinances, incorrect granting of variances, and influential political pressures."
>
> The impetus for amortization may be communal frustration with how long it has taken nonconforming uses to "eliminate themselves." The Supreme Court of Missouri [in *Hoffmann v Kinealy*, 389 SW2d 745, 750 (Mo, 1965)] explained that some communities have addressed the problem of persistent, nonconforming uses by recourse to legislative legerdemain:
>
> "[Z]oning zealots have been casting about for other methods or techniques to hasten the elimination of nonconforming uses. In so doing, only infrequent use has been made of the power of eminent domain, primarily because of the expense of compensating damaged property owners, but increasing emphasis has been placed upon the amortization or tolerance technique which conveniently bypasses the troublesome element of compensation."

---

[5] Amortization is a term commonly applied to ordinances that eliminate nonconforming signs over time. See n 2, *supra.*

[6] For an example of such a case, see East Lansing's cited case of *Art Neon, supra* at 121-122.

Courts in states passing favorably on amortization "reason" that, where the private loss to property owners is outweighed by the public benefit of amortizing nonconforming uses, there is no constitutional difficulty if the period of amortization is reasonable.[7] A reasonable amortization period has been said to be one that allows affected property owners adequate time to recover their investment. In this connection, reference is sometimes made to the economic life of the property, such as a "depreciation" period, either in financial accounting or tax accounting terms.[8]

While a community is surely empowered to exercise police power in furtherance of public heath, safety, and general welfare, and "[e]very exercise of the police power is apt to affect adversely the property interest of somebody," the notion that the right or need of the community to exercise its police power may somehow "outweigh" private property interests runs counter to the constitutional limitation requiring payment of just compensation for a taking.

The introduction of a temporal component does not alter the analysis. As the court in [*Hoffmann, supra* at 753] said:

"To our knowledge, no one has, as yet, been so brash as to contend that such a pre-existing lawful nonconforming use properly might be terminated *immediately*. In fact, the contrary is implicit in the amortization technique itself which would validate a taking *presently* unconstitutional by the simple expedient of *postponing* such taking for a 'reasonable' time. All of this leads us to suggest, as did the three dissenting justices in *Harbison v City of Buffalo* [4 NY2d 553, 566-567; 176 NYS2d 598; 152 NE2d 42 (1958)], that it would be a strange and novel doctrine indeed which would approve a municipality taking private property for public use without compensation *if the property was not too valuable and the taking was not too soon,* and prompts us to repeat the caveat of Mr. Justice Holmes in [*Pennsylvania Coal, supra* at 416], that '[w]e are in danger of for-

---

[7] For an example of such a case, see East Lansing's cited case of *Art Neon, supra.*

[8] For an example of such a case, see East Lansing's cited case of *Art Neon, supra* at 122.

getting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.' "

The application of "generally accepted accounting principles" in this context is unpersuasive. No reasonable person would seriously suggest that the owner of the Empire State Building could be required, in the exercise of the police power, to remove the building from the land, or even to rebuild it to current specifications, at the conclusion of a thirty- or fifty-year period mandated pursuant to the Internal Revenue Code as representing the useful life of buildings for tax depreciation purposes, without paying just compensation. [Citations omitted.]

## Justice Levin also noted:

A further factor sometimes taken into account in calculation of a reasonable amortization period is whether the affected property owner, by virtue of the *prospective* ban on the similar use of property by other owners in the community, receives the benefit of a temporary "monopoly" on the nonconforming use. The implicit assumption of this analysis is that the community has a greater right to deprive persons of the use and enjoyment of their property if the community has taken action that indirectly enhances the value of such property.

This argument, like the balance of the analysis applied by the courts finding that amortization does not effect a taking, overlooks the principle that unless a property right is at the outset insubstantial, neither the state nor local governmental units to which the state delegates police power may deprive persons of the use and enjoyment of their property without paying just compensation. The gratuitous, and assertedly fortuitous effects, if any, of "monopoly" do not alter this principle. [*Adams I, supra* at 236, n 47.]

Justice LEVIN's separate opinion in *Adams I* did not command a majority of the justices[9] and therefore is not binding on this Court. *Butterworth Hosp v Farm Bureau Ins Co*, 225 Mich App 244, 248; 570 NW2d 304 (1997). Nevertheless, we find Justice LEVIN's opinion persuasive and adopt it as our own. Thus, for the reasons expressed in Justice LEVIN's opinion, we reject East Lansing's contention that subsection 8.39(8), as applied to Adams' billboards, does not constitute a taking because Adams has been given a reasonable period to comply with the ordinance and recover a substantial return on its investment.

Next, East Lansing contends that no claim of a taking can be sustained in this case because enforcement of subsection 8.39(8) against Adams' off-premises billboards does not deny Adams all economically beneficial use of its property.

As indicated previously, the property interests claimed to have been taken in this case are real property interests. Thus, we find the appropriate analysis enunciated in *K&K*, *supra* at 576-577 (citations omitted):

> The United States Supreme Court has recognized that the government may effectively "take" a person's property by overburdening that property with regulations. . . . While all taking cases require a case-specific inquiry, courts have found that land use regulations effectuate a taking in two general situations: (1) where the regulation does not substantially advance a legitimate state interest, or (2) where

---

[9] Specifically, the majority opinion, noting that the trial court had not addressed the taking issue, stated that Justice LEVIN's analysis of the taking issue was "dicta, interesting dicta, but irrelevant to the outcome of this case." *Id.* at 219, n 15.

the regulation denies an owner economically viable use of his land.

The second type of taking, where the regulation denies an owner of economically viable use of land, is further subdivided into two situations: (a) a "categorical" taking, where the owner is deprived of "all economically beneficial or productive use of land," or (b) a taking recognized on the basis of the application of the traditional "balancing test" established in [*Penn Central, supra*].

In the former situation, the categorical taking, a reviewing court need not apply a case-specific analysis, and the owner should automatically recover for a taking of his property. A person may recover for this type of taking in the case of a physical invasion of his property by the government (not at issue in this case), or where a regulation forces an owner to "sacrifice *all* economically beneficial uses [of his land] in the name of the common good . . . ." In the latter situation, the balancing test, a reviewing court must engage in an "ad hoc, factual inquir[y]," centering on three factors: (1) the character of the government's action, (2) the economic effect of the regulation on the property, and (3) the extent by which the regulation has interfered with distinct investment-backed expectations.

### The Court further explained:

While there is no set formula for determining when a taking has occurred under [the balancing] test, it is at least "clear that the question whether a regulation denies the owner economically viable use of his land requires at least a comparison of the value removed with the value that remains." [*Id.* at 588 (citation omitted).]

With respect to Adams' rooftop billboards, East Lansing's claim that subsection 8.39(8) does not deny Adams all economically beneficial use of its property is dependent on East Lansing's argument that the applicable "unit of property" is not each individual sign, but, rather, is Adams' aggregate signs in either

the "entire Lansing metro market" or the East Lansing area. East Lansing contends that application of subsection 8.39(8) to Adams' rooftop billboards therefore does not constitute a taking because, even after the rooftop billboards are eliminated, Adams will still have signs in either the Lansing or East Lansing markets and thus Adams has not been denied all economically beneficial use of its property.

As explained in *K&K*, *supra* at 578-580 (citations omitted):

> One of the fundamental principles of taking jurisprudence is the "nonsegmentation" principle. This principle holds that when evaluating the effect of a regulation on a parcel of property, the effect of the regulation must be viewed with respect to the parcel as a whole. Courts should not "divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." Rather, we must examine the effect of the regulation on the entire parcel, not just the affected portion of that parcel.
>
> The denominator parcel is also not limited to each parcel of property. As explained by the United States Court of Appeals for the Federal Circuit in *Tabb Lakes, Ltd v United States*, 10 F3d 796, 802 (CA Fed, 1993):
>
> "Clearly, the quantum of land to be considered is not each individual lot containing wetlands or even the combined area of wetlands. If that were true, the Corps' protection of wetlands via a permit system would, ipso facto, constitute a taking in every case where it exercises its statutory authority." [Citations omitted.]
>
> This Court has previously found the nonsegmentation principle applicable to two adjoining parcels of property with unity of ownership. . . .

*       *       *

>Determining the size of the denominator parcel is inherently a factual inquiry. As explained in *Ciampitti v United States*, 22 Ct Cl 310, 318-319 (1991):

>"Factors such as the degree of contiguity, the dates of acquisition, the extent to which the parcel has been treated as a single unit, the extent to which the protected lands enhance the value of remaining lands, and no doubt many others would enter the calculus. The effect of a taking can obviously be disguised if the property at issue is too broadly defined. Conversely, a taking can appear to emerge if the property is viewed too narrowly. The effort should be to identify the parcel as realistically and fairly as possible, given the entire factual and regulatory environment."

In this case, East Lansing raises the "denominator parcel" issue for the first time on appeal. Generally, issues not raised before the trial court are not preserved for appeal. *Schellenberg v Rochester Lodge No 2225*, 228 Mich App 20, 28; 577 NW2d 163 (1998). It is true that this Court may address constitutional questions not raised below where no question of fact exists and the interests of justice and judicial economy so dictate. *Great Lakes Division of Nat'l Steel Corp v Ecorse*, 227 Mich App 379, 426; 576 NW2d 667 (1998). However, determining the denominator parcel is a factual inquiry. *K&K, supra* at 580. Thus, we decline to consider this issue.

In any event, contrary to East Lansing's argument on appeal, it is clear from the record that the denominator parcel used by the trial court was not Adams' individual signs. Rather, the denominator parcel used by the trial court was Adams' real property interests in the places where its signs are located, i.e., its fee simple interest at the Point and its separate leasehold interests at 111 North Harrison and 1108 East Grand River, with the income generated by the individual

signs simply used to determine the value of these real property interests. Even if we were to consider the denominator parcel issue, we would find no error because, under the factors enunciated in *K&K*, it is realistic and fair to consider each of Adams' real property interests separately for purposes of the taking analysis in this case. *Id.* at 580.

The trial court found that subsection 8.39(8), as applied to Adams' rooftop leaseholds, constituted a categorical taking. Because the code requires that the rooftop billboards must be removed and no suggestion has been made that Adams might make some other economic or beneficial use of its rooftop leaseholds, we find no error in this regard. We further note that East Lansing raises no argument with respect to the method used to value the rooftop leaseholds. Therefore, we affirm the trial court's final order with respect to Adams' rooftop billboards.

Finally, East Lansing contends that even when the Point is considered the denominator parcel, enforcement of subsection 8.39(8) does not deny Adams all economically beneficial use of the Point because Adams will still be permitted to have four sign faces at this location under the code. East Lansing contends that the trial court thus erred in determining that subsection 8.39(8), as applied to the Point, constitutes a taking.

As indicated previously, Adams was primarily concerned at trial with establishing the amount of its loss at the Point. In determining this amount, the appraiser's testimony assumed that Adams would be permitted to maintain four sign faces at the Point generating approximately $20,000 in gross income, thus indicating that subsection 8.39(8) does not deny

Adams all economically beneficial or productive use of its fee simple at the Point. Therefore, for the purpose of determining whether enforcement of subsection 8.39(8) effected a taking at the Point, the trial court should have applied the ad hoc factual inquiry required by the three-part balancing test, including " 'a comparison of the value removed with the value that remains.' " *K&K, supra* at 588 (citation omitted).[10]

However, with respect to the Point, the trial court considered only the second factor (the economic effect of the regulation on the claimant) of the three-part balancing test. Moreover, the court considered this factor only in a limited manner. Specifically, as did Adams, the court focused only on the value of the loss sustained by Adams at the Point. Thus, while the court made a specific finding with respect to the value removed at the Point, the court made no specific finding with respect to the value remaining at the Point. We note that such a value might be calculated on the present record where it was assumed that Adams would be permitted to maintain four sign faces generating a gross income of $20,000. However, Adams disputed this assumption below, arguing that even assuming four sign faces were theoretically or mathematically possible at the Point, there was no showing that the signs would be "usable."

Therefore, as in *K&K, supra* at 588, we believe it would be "imprudent to decide whether there was a taking of [Adams'] property [at the Point] on the basis

---

[10] To be fair, although the taking cases relied on by our Supreme Court in *K&K* were decided before the trial in this case, *K&K* itself, with its excellent summary of the law in this area, was not decided until after the trial in this case.

of an inadequate record." Therefore, we reverse the trial court's final order with respect to the Point and remand to the trial court for further consideration. The court must calculate the value remaining at the Point and then reevaluate Adams' claim of a taking at the Point under the three-part balancing test. The trial court may, but need not, take additional proofs to supplement the existing record as it, in its learned discretion, deems necessary to properly consider the three-part balancing test.

In summary, we affirm the trial court's final order with respect to Adams' rooftop billboards. We reverse the trial court's final order with respect to Adams' freestanding billboards at the Point and remand for further proceedings in accordance with this opinion.

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction. No taxable costs pursuant to MCR 7.219,  neither party having prevailed in full.